## BERRY, Appellant, v. ROOD et al.

### Division One, March 29, 1902,

1. **Appellate Practice**: DEFECTIVE ABSTRACT: REFERENCE. The failure of the appellant in a reference case to bring up the evidence will not necessarily work an affirmance or dismissal, but the appellate court will not, in such case, consider any of appellant's exceptions relating to findings of facts by the referee, but will accept those findings as true, and will consider only the conclusions of law drawn from those facts.

2. ————: RECITAL OF FACT. A recital of a fact in the appellant's abstract is conclusive of its truth, unless respondent disputes that recital in a counter abstract.

3. **Corporation Receiver**: SUBSCRIPTIONS TO STOCKS: NOTICE TO STOCK-HOLDERS. On appeal in a suit to compel stockholders to pay the unpaid part of their stock, it is immaterial whether or not they had been notified before suit was brought to pay the balance due, if their defense is that nothing was due.

4. **Corporation**: OVERISSUE OF STOCK: LIABILITY OF STOCKHOLDER: FRAUD. When property is taken in payment of stock of a corporation the stockholder is liable at the suit of a creditor of the company without notice, to account for the difference between the true value of the property and the face value of the stock. And this is the Missouri Constitution and statutes even though, no actual fraud be shown.

5. ————: ————: ————: MINING COMPANY: CREDITORS: KNOWLEDGE: AMOUNT OF JUDGMENT. In a suit by a receiver of a corporation, the stockholders who turned over certain mining lands and machinery to the company and received stock in payment therefor, are respectively liable for the difference between the real value of the property turned over and the face value of the stock, and judgment may be entered against them individually for so much of that difference as may be necessary to pay off the debts of the concern to such creditors as extended credit without knowledge of the fact that the corporation had accepted property in payment of stock, and for costs.

6. ————: ————: ————: BELIEF. And in such case the fact that the incorporators believed the mining lands and machinery turned over to

Berry v. Rood.

the company were worth all the stock given in payment therefor, has nothing to do with their legal liability.

7. ———: ———: ———: KNOWLEDGE OF CREDITOR. A creditor who knows that a corporation has accepted property of less value than the face of the stock in full payment of its stock, and so knowing loans money to the corporation, can not call on the stockholder to contribute towards the payment of his debt.

8. ———: ———: ———: LIABILITY OF SUBSEQUENT PURCHASER OF STOCK. The purchaser of stock from an original subscriber, and a purchaser of treasury stock which had been issued to a stockholder as trustee and by him sold in pursuance to an order of the board to secure money for operating purposes, the stock in each case being sold for less than its face value, and without knowledge by the purchaser that it was not originally fully paid up or had been issued in payment of property turned over to the company, are not liable for the difference between the price paid by them and the face value of the stock.

9. ———: ———: ———: RIGHT OF RECEIVER TO SUE. A receiver derives his authority from the court, and the court has authority to direct him to bring suit to compel stockholders to contribute the difference between the face value of the stock and amount paid therefor, for the benefit of creditors of the corporation who have given it credit in the belief that its stock was paid up in money or actual property.

10. ———: ———: ———: TENDERING BACK STOCK. When a corporation is in a winding-up process the creditors are entitled to have its assets on hand sold for the payment of their debts, and if, after the tangible assets are disposed of, their debts remain unsatisfied, they have the right to collect or have collected for them the balance due on stock subscriptions without tendering back the partial money or property taken at exaggerated valuation.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED AND REMANDED.

*Lee W. Grant, P. R. Flitcraft* and *W. B. Homer* for appellant.

(1) In an action at law the report of the referee is considered as equivalent to a special verdict by the jury, and in

appeals in such cases the appellate court will look entirely to the ultimate facts as found by the referee, and give the judgment of the appellate court accordingly.    O'Reilly v. Cleary, 8 Mo. App. 188; Gamble v. Gibson, 83 Mo. 290; Singer Mfg. Co. v. Givens, 35 Mo. App 602.    There are a number of other cases in which appellants have taken appeals on cases heard by referees without taking to the appellate court a complete transcript of the testimony, and the appellate courts have acted upon the report of the referee, applying the law to the facts as found by him.    (2)    The stock and bonds of a corporation shall be issued only for money paid, labor done, or money or property actually received.    Const., art. 12, sec. 8; R. S. 1899, sec. 962; Chouteau v. Dean, 7 Mo. App. 210; Kehlor v. Lademann, 11 Mo. App. 550.    The capital stock of a corporation is a trust fund for the benefit of its creditors. Where a contractor in a corporation enters into an agreement whereby the contractor is to perform work and furnish material to the corporation and to take stock in payment, such contractor can charge therefor only the reasonable market value for such labor and material thus given in exchange, and this is the case even though no fraud be proven.    Shickle v. Watts, 94 Mo. 410; Leucke v. Tredway, 45 Mo. App. 507; Bank v. Gallaher, 43 Mo. App. 493; Shepard v. Drake, 61 Mo. App. 134; Van Cleve v. Berkey, 143 Mo. 109.    (3)    Whether we regard this as money stolen by Leighton from the jewelry company and then by him loaned to the onyx company, or whether it was a case of the president of the jewelry company making an unauthorized loan of its funds to the onyx company, the law is well settled that when an officer of a corporation is dealing with it in his individual interest, the corporation is not chargeable with his uncommunicated knowledge of facts derogatory to his title to the property in question.    Bank v. Lovitt, 114 Mo. 525; Johnson v. Shortridge, 93 Mo. 227. (4)    On the other hand, it is also the law that the knowledge which comes to a corporation officer through his own private

transactions, or beyond the range of his official duties, is not the knowledge of the corporation, and attaches to it no responsibility by way of notice.   State Savings Association v. Printing Co., 25 Mo. App. 650; Barnes v. Trenton Gas Company, 27 M. J. E. 36; Bank v. Skinner, 62 Pac. Rep. 705.

*Dawson & Garvin, Smith P. Galt* and *Leonard Wilcox* for respondents.

(1)   We unhesitatingly assert that there is no case in the books that support the contention of appellant in this case, that, when stock in a corporation is paid for by a contract between the corporation and parties who acquire the stock, by their transferring to the company property of a substantial value (it is admitted in the petition here that the property transferred in this case was worth at least $30,000) and in fixing the value thereof the parties to the contract acted in good faith, and "as ordinarily careful business men would have acted under the same circumstances and conditions, and they exercised reasonable and ordinary business judgment and discretion in fixing the value of the property," nevertheless, because success does not follow the venture, they shall be held responsible therefor. Certainly none of the cases cited by appellant countenances any such doctrine, for the purpose of "robbing Peter to pay Paul." The facts existing at the time of the transaction, decide for or against its validity, and it matters not whether it involves oil or onyx property.   (2)   Whatever may be the facts with reference to creditors there is absolutely, so far as we know, no conflict in the authorities to the effect that as between the corporation and its stockholders the stock was fully paid, and if there is any liability on the part of these defendants to any one it is to creditors of the corporation and not to the corporation itself.   This must be so on principle.   If the corporation is authorized to take the property in payment of its stock, and that is the settled law of Missouri, it must also have the

authority to determine the valuation at which the property shall be received. It is the settled law of Missouri that an assignee of a corporation stands in the shoes of the corporation and can not recover against the stockholders as for unpaid stock unless the corporation could have recovered. Haskell v. Worthington, 94 Mo. 574; Republic Ins. Co. v. Sweigert, 135 Ill. 167. This receiver has no other or greater rights against the stockholders, the defendants, than an assignee for the benefit of creditors would have. The rule is that when a receiver is appointed for the purpose of taking charge of the property and assets of a corporation, he is, for the purpose of determining the nature and extent of his title, regarded as representing only the corporate body itself and not its creditors or shareholders, being invested by law with the estate of the corporation and deriving his own title under and through it and for the purpose of litigation he takes only the right of the corporation, such as could have been asserted by it in its own name and that upon that basis only can he litigate for the benefit of their stockholders or creditors. Republic Ins. Co. v. Sweigert, supra; Coffin v. Ramsdell, 110 Ind. 417; Beach on Receivers, sec. 607. (3) But even upon the plaintiff's own theory that the receiver may recover in the right of creditors although he could not recover in right of the corporation, the facts in evidence and the findings of the referee are fatal to his recovery. It is alleged in the petition that the property received by the corporation in payment of its capital stock was in its possession and control at the time the receiver was appointed and that prior to the bringing of this suit he had sold it. This property had been in the possession of the corporation from the date of its organization in March, 1891, until it was sold by the receiver, January, 1894, a period of nearly three years. There had at no time been any objection on the part of the corporation or anybody to the valuation at which it had been put into the company during all this period. The referee finds that the sale by the receiver was made with the consent

of all the creditors, and with full knowledge of all the facts
connected with the transfer of the property.    He further finds
that the proceeds of this sale were distributed by the receiver
amongst the creditors.    These facts, even if for the sake of
argument it be conceded that the receiver represents creditors
in the sense contended for by plaintiff, constitute an absolute
estoppel both against him and them.    Forman v. Bigelow, 4
Cliff. (U. S.) 508; Coffin v. Ramsdell, supra; Cook on Stock
and Stockholders (3 Ed.), secs. 46 and 47.

VALLIANT, J.—This appeal comes up on a copy of the
judgment and of the order granting the appeal in lieu of a
full transcript, and the printed abstract filed by appellant gives
what purports to be the substance of the pleadings and of some
of the orders of the court, including an order of reference,
the report of the referee, the exceptions to the report, the
rulings on the exceptions and the judgment.    The evidence
before the referee is not given.    The respondents file a motion
to affirm and a motion to dismiss the appeal for alleged insuffi-
ciency of the abstract and failure to comply with the rule of
court in that respect.

Since appellant has failed to bring up the evidence he
can not ask this court to consider any of his exceptions relating
to the findings of fact by the referee, but must accept those
findings and can complain only of the conclusions of law drawn
from those facts.    Respondents have no ground to complain
of this because the findings of the referee are in the main in
their favor.    The motions to affirm and dismiss are therefore
overruled.

The suit is by the receiver of the Ozark Onyx Company
against the stockholders of that corporation, to recover balances
he claims to be unpaid on their several stock subscriptions.

The case was referred to Mr. P. Taylor Bryan, who made
an elaborate report, which is set out in the printed abstract,
Vol 168 mo—21.

and which contains all the facts that are given us in the case, and from which we make the following summary:

The corporation was formed under the laws of this State in 1891 with a nominal capital of $300,000, stated in its articles to have been all subscribed and fully paid in cash. None of the subscriptions, however, were paid in cash, but the organizers were the owners of certain lands in Pulaski and Crawford counties, believed to contain valuable onyx deposits which, pursuant to the understanding among them from the beginning, they put into the concern at a valuation of $200,000, as in payment to that extent of their subscriptions, and one subscriber, being the owner of certain onyx works and machinery in Vermont, put the same in at a valuation of $90,000, as in payment of his subscription to that extent. On the subject of the actual values of these properties the referee in his report, after referring to the deposits of onyx on the lands, said: "The conclusion of the referee on these facts is that these deposits added little, if any, real value to the land. There was no evidence before the referee sufficient to enable him to determine accurately what was the real value of the lands of the Leighton syndicate and Rood. While they were worth probably more than what was received for them at the receiver's sale, the referee would not be justified in finding that the lands turned in by the Leighton syndicate were, in fact, of any greater value than the amount which Leighton paid for them, namely, $4,000 or $4,500, or that the lands turned in by Rood were of any greater value than the amount which Rood paid for them, namely, $3,000."

And on the subject of the value of the property turned in by the Vermont man, the referee after discussing it in detail says: "The referee concluded, therefore, that the real value of the entire property of all kinds, turned in by Reynolds in payment of the $90,000 worth of stock originally subscribed by him, did not exceed the value of the plant and machinery and that portion of the supplies which were turned in by him.

The value of the entire plant, including machinery valued at cost (according to Reynolds's books) and of the supplies was, as is shown by the report of Rivers offered in evidence, at least $28,254.45. As the machinery had been in use it probably was not at that time worth quite that much. According to the agreement between Reynolds and the company, all over the value of $15,000 had to be paid for in addition to the issue of the original $90,000 of stock to him. This was done subsequently by paying him $5,000 in cash and by the issue to him on July 15, 1891, of $9,000 worth of treasury stock. So the referee concludes that the entire actual value of the property turned in by Reynolds in payment of this original subscription did not exceed $15,000, and since the machinery had been in use it did not amount to quite that much. That the entire property turned in by the original incorporators was very greatly overvalued, we think, therefore, has been clearly established."

But in spite of those facts the referee found that these men verily believed that they had onyx mines of wonderful wealth on their lands, and that the same were worth at least the amount at which they were turned into the company in payment for their stock, namely, $200,000. And the referee was also satisfied that they believed that the advantage to the new corporation that would accrue from having the Vermont concern break up its established business in that State and remove with its machinery, its business, its secret processes in handling onyx, its prestige, its good-will, was worth the $90,000 at which the company took the same in payment of the stock issued therefor.

Then the referee, coming to the question of fraud, said:

"The referee has, at the expense of trying the patience of the court, gone into each fact which has been urged by the plaintiff as showing fraudulent intent in incorporating this company. He has done this because the case is one where the property transferred to the corporation was, as subsequent events have disclosed, of a small value as compared to the capi-

tal stock issued therefor. But after a thorough examination of the facts, and though the referee believes that in many respects the original subscribers to stock acted incautiously he has not been able to arrive at the conclusion that the incorporators were guilty of any intentional deception as to the public or creditors of the corporation. In valuing the property which was transferred to the corporation, they valued it on the theory that the lands taken in connection with the plant and processes and management of Reynolds would yield a dividend of six per cent at least upon the valuation; and while it is probable that neither the land by itself, not the plant of Reynolds by itself, nor any one of the items of property which went to make up the entire amount of property turned into the corporation, could have been sold even at that time in the open market at the value placed upon them, yet when taken together it is readily conceivable that they might have been considered worth, in the minds of the incorporators, the price at which they were turned into the corporation. If the lands in Pulaski and Crawford counties had been really lands having large deposits of onyx of good quality, they might well have been thought worth the par value of the stock issued for them."

After the formation of the corporation the original incorporators transferred to the treasurer of the concern as trustee, each one-third of his stock, to be sold to raise a working fund for the benefit of the corporation. Some of this treasury stock was sold to certain of the defendants in this suit at fifty cents on the dollar of its face value, and the plaintiff seeks to hold those purchasers in this proceeding liable for the remaining fifty per cent. The referee finds that those men purchased the stock in good faith believing it had been originally fully paid.

There were also some private sales by the original stockholders of part of their shares. The referee does not know from the evidence how much was paid at such sales except in the case of Mr. Brown who paid forty per cent of the face

value.     The referee finds as to those purchasers that they bought believing the stock was fully paid.

The concern ran about two years, during which its efforts to develop its onyx mines resulted in disappointment, became involved in debt and was finally brought to an end by a suit at the instance of the assignee of the Providence Jewelry Company, a creditor, in which suit a receiver was appointed to take charge of the corporation and wind up its affairs.    After the appointment of the receiver, creditors were notified to come in and prove up their claims, whereupon creditors came in and claims were proven up and allowed by the receiver, who under order of the court was acting as auditor of claims, to the amount of $25,258.85.    Of that amount, $19,487.49 was allowed in favor of the assignee of the Providence Jewelry Company.    One of the original incorporators of the Ozark Onyx Company was the defendant, James F. Leighton, who owned 6,000 shares of the stock which he had paid for with part of this Pulaski county land, and he was the president and chief business man of the concern.    He was also the president and chief business manager of the Providence Jewelry Company. It was he who advanced the money to the onyx company which made the debt allowed in favor of the assignee of the Providence Jewelry Company. The referee could not find from the evidence whether the money so advanced was the money of Mr. Leighton or that of the jewelry company of which he was president.    It was advanced from time to time in various sums, and finally put in the shape of notes signed by the Ozark Onyx Company and J. F. Leighton, president, payable to J. F. Leighton, and by him indorsed in blank and turned over to the Providence Jewelry Company, and these were found by the assignee among its assets after it made an assignment.

None of the other creditors who proved up their claims had any such connection with the onyx company as rendered them chargeable with notice, when they extended the credit,

that the stock had not been paid, or had been paid only in the manner mentioned.

The referee takes up the subject of the conduct of the business and points out that it was conservative, guarding as far as possible against incurring debts, calls attention to the fact that the total amount of debts established did not exceed the value of the property turned in by the stockholders according to the actual prices they paid for it, and that of the debts incurred the largest part was advanced by Mr. Leighton himself. Then the referee concludes that subject thus:

"The referee finds, therefore, that the original subscribers to the capital stock of the company did not intend to deceive the future creditors of the company; nor were they actuated by any improper motive in paying for their stock with the property in question. The referee further finds that though the incorporators may have been guilty of a lack of caution in valuing the property which was turned into the corporation, yet it can not be said that they had no reason for their belief as to the value of the property, nor was their action so utterly reckless as to convince the referee that they were indifferent as to what was the actual value of the property. The referee, therefore, finds that in the organization of the company there was no actual fraud."

After the amount of the indebtedness had been thus ascertained the receiver was ordered by the court to sell the assets of the corporation for the purpose of paying its debts. Under that order the receiver sold all the property of the company including the lands in Pulaski and Crawford counties, and the machinery, plant, etc., and realized at the sale about $4,500, out of which he paid a dividend of a small fraction less than seven per cent to the creditors. Then the court ordered the receiver to proceed to collect from the stockholders by suit if necessary the amount owing by them for stock issued to them, in pursuance of which order this suit was brought.

The referee, after a learned discussion of the subject and

review of the authorities, concluded that the rule of law now recognized in this State is that where a corporation issues full-paid stock for property received by it as payment, the stockholder is not liable to creditors of the corporation for any difference between the real value of the property and the face value of the stock unless there was fraud in the transaction, and the report on that subject concludes thus: "The referee having found as a fact that there was no actual fraud in the transaction by which the capital stock was issued fully paid, in exchange for the property turned into the corporation, it follows that all the stock of the corporation must be held to have been in fact full-paid and that none of the defendants can be called upon to make any further payments upon any of the shares held by them." The report ends with a recommendation that judgment be entered for the defendants. Exceptions to the report were filed on behalf of the receiver which were overruled and judgment entered as recommended from which judgment the receiver brings the cause here by appeal.

I. Respondents in their brief say that the judgment should be affirmed for failure of proof, particularly on two points, first, that the plaintiff here was appointed receiver, second, that he gave the notice required by order of the court to be given to the stockholders to come in and pay the amounts due on their stock subscriptions before bringing this suit.

The abstract purporting to represent the record states that the St. Louis Trust Company was originally appointed the receiver, that it resigned and the plaintiff was appointed in its stead. Respondents have filed no counter abstract and have not disputed that fact.

As to the failure of proof that notice was given, it is immaterial in the present stage of the case. The only purpose of the notice was to afford the defendants an opportunity to come in and pay up without being put to the expense of a suit, and if any of them had desired so to do they could have so expressed in their answers when sued, and upon showing that

they had not been notified before suit, as the order of court had required, they would have been allowed to pay what was due and depart without costs.

II.   The main proposition, however, upon which reliance is had to sustain the judgment of the circuit court, is, that a stockholder who has turned into the corporation property in payment of his stock which has been accepted by the corporation as the equivalent of the face value of the stock and who has been guilty of no actual fraud, can not be called to account by creditors of the concern or made to pay in satisfaction of debts, the difference between the value of the property turned in and the face value of the stock.   This proposition as contended for, under the facts of this case, also draws a distinction, in favor of the stockholder, between actual fraud and legal fraud and leaves him on the safe side of the line, although the property he turned in was in fact worth less than five per cent of the face value of the stock, provided we find that his mind had been so excited by indications of prospective mineral wealth that he really believed that, when the unexplored caverns should be opened, mines of fabulous value would be disclosed.

If that is the correct interpretation of the law of Missouri on this subject, then the manifest efforts of the framers of our Constitution and the makers of our statutes to authorize the establishment of only conservative and reasonably safe business corporations has been in vain.   Our Constitution ordains that "no corporation shall issue stock or bonds, except for money paid, labor done or property actually received."   [Art. 12, sec. 8.]   The money, the labor, and the property mentioned, are on a plane, and signify equivalents.   If property worth five per cent of the face value of the stock can be taken as full payment then five per cent in money is equally available, and the Constitution affords the people no protection against the wildest schemes.   This clause in the Constitution puts a limit on the power of the Legislature, so that if that

body should attempt, it could not, authorize the organization of a corporation with power to issue stock without receiving its equivalent in money, labor or property. But whilst the Legislature can not go beyond that limit, it is not compelled to go to the limit and may, if it should see fit, make the restrictions as to issuance of stock more strict. In section 962, Revised Statutes 1899, the General Assembly follows the language of the Constitution, using the negative form of expression that stock or bonds shall be issued only for money, labor or property. That section is general as to all corporations and will apply to all unless by law a different requirement is made for corporations of a particular class. Manufacturing and business corporations are treated in the statutes as a class in themselves, with some provisions applicable to them not applicable to other kinds of corporations. Section 1312, Revised Statutes 1899, governing this class of corporations, requires the incorporators in their articles of association to certify that the shares of capital stock have all been bona fide subscribed and one-half thereof actually paid up in lawful money of the United States and in the actual custody at that time of the persons named as the board of directors. Even in the face of that unequivocal language this court has held, in this kind of corporations, that the stock may be paid in labor or property, and that has been too long a rule of business conduct to question it now. But we make this reference to the emphatic language of our Constitution and statutes at this time to emphasize the fact that our lawmakers, as far as they could, have endeavored to place Missouri on conservative and safe grounds in this respect. And that this is understood by the business community is shown by the well-known fact that many corporations designed to operate alone in this State are organized under the laws of other States which are supposed to be more liberal to the promoters and less careful of the rights of persons who may come in their way in the course of business. If we adopt the rule of construction of our written law that

the referee and the trial court have laid down, then, there will be no necessity for men to shun Missouri as a forum in which to organize the wildest and most visionary schemes, for by such interpretation we break down all the safeguards that distinguish ours from any other laws. But that is not the proper interpretation of our law.

In Shickle v. Watts, 94 Mo. 410, it was held that when one agrees with a corporation to take its stock in payment of labor, only the reasonable value of the labor will be regarded as payment, and that in the interest of creditors an agreement by the corporation to pay more than the value (in that case the stock had been taken at fifty cents on the dollar of its face value) would be disregarded and held for naught. "And this is the case, even though no fraud be proven."

In Woolfolk v. January, 131 Mo. 620, the sentence just quoted is disapproved, but subsequently, in Van Cleve v. Berkey, 143 Mo. 109, the subject was again before the court and the cases of Shickle v. Watts and Woolfolk v. January were distinguished and the criticism of the former in the opinion in the latter is said to have been *obiter* and that the doctrine of Shickle v. Watts was so wholesome and salutary that it ought not to be weakened or impaired by what was said of it in Woolfolk v. January. In Van Cleve v. Berkey, supra, the authorities are reviewed and the law clearly defined in an exhaustive opinion by Brace, J., in which all concurred, including the writers of the opinions in the two other cases. We feel that nothing is needed now to add to what is said in that opinion to demonstrate that our Constitution and statute mean that when property is taken in payment of stock the stockholder is liable at the suit of a creditor to account for the difference, if any, in value between the price at which the property was turned in to the company and the face value of the stock, and this is so even though no actual fraud be shown.

The following quotation from the opinion of Judge

BRACE in the Van Cleve case expresses the law: "It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent, in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid and that the money or its equivalent in property will be forthcoming to respond to his legitimate demands. In short, that it is the duty of the stockholder, and not of the creditor, to see that it is so paid; hence, the inquiry in a case between the creditor and a stockholder when property has been paid in for the capital stock of a corporation, is not whether the stockholder believed or had reason to believe that the property was equal in value to the par value of the capital stock; but whether, in point of fact, it was such equivalent."

When men are carried away by a mining prospect, they have a right to take such chances in speculation as they see fit in order to develop the prospect, provided they involve only themselves. But when they attempt to hide their individual liability in a corporation and launch upon the business community a company which they proclaim as solemnly as men can proclaim anything, has a full-paid capital of $300,000, and invite confidence accordingly, when they well know that, so far as then developed, it has not five per cent of the amount available for use in the treasury, they violate both the letter and spirit of our laws on this subject and render themselves individually liable, to creditors who have been misled, to the extent of their unpaid stock.

The referee found that these incorporators on the faith of having seen some samples of onyx taken from these lands, samples neither large in size nor pure in quality, honestly be-

lieved that they had obtained fields of fabulous wealth and therefore were guilty of no fraud. Their belief in the matter would exonerate them from the imputation of doing an intentional dishonest act, but they can not stand blameless in the eyes of the law under the charge of legal fraud when they have put a false face on their papers of incorporation knowing that they did not express the true condition and have then allowed people to give credit to the concern on the faith of that showing.

We hold that the original incorporators are liable in this suit for the difference between the real value of the property they respectively turned into the corporation in alleged payment of their stock and the face value of the stock they respectively received to the extent that may be necessary to pay off the debts of the concern to creditors who extended credit without knowledge of the fact that the corporation had accepted the property in payment of the stock, and to the extent also of the cost of this proceeding.

III. The report of the referee shows that those defendants who bought shares of the treasury stock, bought it in good faith believing it had been fully paid, although they paid only fifty per cent of its face value.

This treasury stock stood in the name of Jos. T. Bascom, trustee, and that fact was an indication to the purchasers that it had been previously issued and that their purchases were not original takings of the stock. There was nothing in the fact that it was sold by the company at a discount to cause the purchaser to know that it had not been originally paid in full. Such stock is liable to fluctuation. If they had purchased with knowledge of the fact that the stock was unpaid they would assume towards the creditors of the concern the liability of the original subscriber, jointly with him or severally as the creditor might elect, but that is not the fact as to these purchasers, and we hold that they are not liable in this suit. The same is

true of those who purchased stock from the original subscriber, they are not liable in this suit.

IV. What is above said in regard to the rights of creditors is based on the idea that they gave credit to the concern on the faith of the showing that it had a capital stock of $300,000 which was fully paid. But that is not the fact in reference to the debt allowed in favor of the assignee of the Providence Jewelry Company. The lending of the various sums of money that make up that debt was conducted by Mr. Leighton for both lender and borrower. He was president and chief business man of the Providence Jewelry Company and president and chief business man of this company. Whether the money loaned was his individually or that of the jewelry company the referee did not know. He executed the notes himself some time after the loans had been made, and indorsed and transferred them to the jewelry company. If he was using the jewelry company's money, the jewelry company, so far as this record shows, was acting through him and was chargeable with knowing whatever he knew. On the books of the onyx company it appears as loans from Leighton to the company, was evidenced by notes of the company to Leighton and by him indorsed to the jewelry company, and as such proven up. We are not justified from anything that appears on this record in concluding that the money loaned belonged to the jewelry company. The record is vacant on that point, and the only thing from which even a conjecture could be made is the fact that Leighton transferred the notes to the jewelry company, but if we are driven to conjecture we might as well conjecture that he transferred the notes to give them a better standing in a suit like this than they would have if held by himself. The view taken of the matter by the referee is thus expressed in the report: "Their claim against the shareholders of the company is therefore subject to all the defenses which would exist if Leighton were the claimant, and this is true, of course, whether it be prosecuted by the jewelry company directly, or

whether it be prosecuted by the receiver for its benefit. [Smith on Rec., p. 376, sec. 231.]   The question arises, can the defendants be called, upon that state of fact, above found, to contribution towards the payment of the claim established in favor of the Providence Jewelry Company?   The referee is. of the opinion that they can not be called upon for such purpose." Citing First National Bk. v. Mining Co., 42 Minn. 327; Ft. Madison Bk. v. Alden, 129 U. S. 372; Coit v. Gold Amalgamating Co., 119 U. S. 343, and other authorities.

This view is sustained by the decision in Woolfolk v. January, 131 Mo. 620, before referred to.

If a person, knowing that a corporation has accepted certain property in full payment of its stock, sees fit with that knowledge to lend money to the corporation, he has no more right to call the stockholder to further account for his debt than would the corporation itself.

The creditors who are entitled to the relief prayed for in this case are:

| Name of Claimant. | Date when indebtedness accrued. | Amount. |
|---|---|---|
| National Bank of the Republic. | Between January 18, 1893, to February 7, 1893.... | $4,175 12 |
| F. O. Sawyer Paper Co ...... | March, 1893............ | 11 81 |
| St. Louis Granite Wall Plaster Co...................,...... | May, 1893, to December 1, 1893.... .. ......... | 21 96 |
| Koken Iron.Works....... . | April and May, 1893...... | 2 75 |
| Moser Express and Messenger Co......   ...   ... . ..... | May, 1893.............. | 17 75 |
| C. W. Wall, assignee...... ... | Between April 11, 1893, and May 24, 1893.. ..... | 90 00 |
| J. M. and W. F. Robb......... | During the early part of 1893............ ..... | 10 00 |
| Huttig Sash & Door Co...·...... | From April to December, 1893 ................. | 1,441 67 |

V.   The point is presented in the brief of respondents that a receiver can not maintain a suit like this to recover for

the benefit of creditors; that none but the creditors themselves can maintain such a suit.

A receiver stands in a different position in respect to the right in question from that of an assignee. The assignee derives his authority from the assignor, and, except where the statute makes different provision, he has no greater power than the assignor. A contract, therefore, that the assignor could not attack, the assignee can not attack.

But a receiver derives his authority from the court, which in a case like this, has ample authority and jurisdiction to adjudge the rights of all the parties and enforce them. The receiver is the officer of the court, and when thereto directed represents the interest of either and all the parties to the record. The receiver of an insolvent corporation may, under the direction of the court, maintain a suit to collect assets of the corporation which the corporation had wrongfully put beyond its own power to collect, when such assets are required for the payment of its debts and the winding up of its affairs. This power is in the general equity jurisdiction of the court. [Thompson v. Greeley, 107 Mo. 577; Morawetz on Corp., sec. 868.]

VI. It is finally insisted that the receiver and the creditors are estopped from demanding of these defendants the relief prayed for, because under an order of the court the property turned in to the corporation in payment of the stock has been sold by the receiver and distributed in a dividend to the creditors.

The theory advanced is that the receiver should have first tendered back to the stockholders the property they put in and then proceeded to rescind the contract under which the corpo: tion accepted it in payment of the stock. Respondents say t creditors can not have the proceeds of the property and re diate the contract under which the corporation acquired it.

The creditors have nothing to do with the rescinding the contract. When the corporation is in a winding-up

cess the creditors are entitled to have its assets on hand sold for the payment of their debts, and if, after the tangible assets are disposed of, the debts remain unsatisfied, they have the right to collect or have collected for them the balances due on stock subscription without tendering back partial payments or property given in as payment of exaggerated valuation.

The judgment is reversed and the cause remanded to the circuit court with directions to proceed to adjust the rights of the parties in accordance with the law as herein expressed. All concur.