BABBITT v. READ et al.

(Circuit Court of Appeals, Second Circuit.　June 29, 1916.)

No. 236.

1. CORPORATIONS ☞247—BONDS—EXEMPTION OF STOCKHOLDERS FROM LIABILITY.

A clear provision in a corporation mortgage that the holders of the bonds shall rely for payment entirely on the corporation and its property without recourse upon stockholders because of any personal liability which might be asserted against them is not contrary to public policy and, in the absence of fraud or deception, is enforceable.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 983–997; Dec. Dig. ☞247.]

2. CORPORATIONS ☞478—BONDS—REFERENCE TO MORTGAGE.

A provision in a corporation mortgage which is referred to in the bonds secured is of the same effect as though contained in the bonds themselves.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1871; Dec. Dig. ☞478; Mortgages, Cent. Dig. §§ 208–257, 259–289.]

3. BANKRUPTCY ☞282—RIGHT OF ACTION BY TRUSTEE—ACTION FOR DECEIT.

A trustee of a bankrupt corporation cannot maintain an action on behalf of bondholders against stockholders to recover for fraud committed by them in the sale of the bonds of the corporation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 426; Dec. Dig. ☞282.]

4. COURTS ☞366(1)—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.

Where the highest court of a state has interpreted a state statute in a way showing that it is considered a positive enactment and not merely a re-enactment of the common law, as to rights arising thereafter, its construction is binding on the federal courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 956, 957, 967; Dec. Dig. ☞366(1).]

5. CORPORATIONS ☞232(3)—LIABILITY OF STOCKHOLDERS—STOCK ISSUED FOR PROPERTY—MISSOURI STATUTE.

Under Const. Mo. art. 12, § 8, which provides that "no corporation shall issue stock or bonds, except for money paid, labor done or property actually received," and Rev. St. Mo. 1909, § 2981, which contains the same provision, as construed by the Supreme Court of the state, where a corporation issues stock in payment for property the property must be the fair equivalent in value of the par value of the stock issued for it; otherwise the stockholder receiving it is liable to creditors of the corporation for the difference, whether the overvaluation of the property was intentional or not.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 884; Dec. Dig. ☞232(3).]

6. BANKRUPTCY ☞282—ASSETS—LIABILITY OF STOCKHOLDERS—ENFORCEMENT BY TRUSTEE.

As under the decisions of the same court such liability is an asset of the corporation, it may be enforced by its trustee in bankruptcy for the benefit of the estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 426; Dec. Dig. ☞282.]

7. COSTS ☞32(3)—SUIT BY TRUSTEE IN BANKRUPTCY—PARTIAL SUCCESS.

A trustee in bankruptcy, when he sues a third person, takes the same risks as any other party and cannot impose on defendants, directly or

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

indirectly, liability for costs. made on a supplemental bill setting up an invalid claim, although successful under his original bill.

[Ed. Note.—For other cases, see Costs, Cent. Dig. § 112; Dec. Dig. ⊜⇒32(3).]

8. WORDS AND PHRASES—"VALUE."

The "value" of a thing is what it will presently bring in exploitation or exchange under presently possible conditions.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Value.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Byron F. Babbitt, trustee in bankruptcy of the Randolph-Macon Coal Company, against William A. Read, Seth Sprague Terry, and John S. Melcher, executors of James T. Gardiner, deceased, William T. Van Brunt, and others. Decree for complainant for part of his claim, and both parties appeal. Affirmed.

For opinion below, see 215 Fed. 395.

This case arises upon two appeals from a decree in a suit in equity brought by a trustee in bankruptcy of a Missouri corporation to collect upon stockholders' liabilities for the issuance of stock for less than par. The creditors for whose claims the trustee recovered amounted, together with allowance to counsel, costs, and the like, to more than $160,000, and a decree went for that amount against two New York stockholders, Read and Gardiner. There were excluded from the benefit of the decree, however, the bondholders under a trust mortgage containing a so-called "no recourse" clause, and, because of that clause, these bondholders appeal from that portion of the decree which excluded them, and Read and Gardiner appeal from so much as found them liable at all. Other stockholders were joined, but the bill was dismissed as to them.

The facts, while somewhat complicated, are very fully and accurately reported in the opinion of the District Court (215 Fed. 395), in view of which it is unnecessary to repeat them at length here.

Charles A. Boston, of New York City, and P. Taylor Bryan, of St. Louis, Mo., for appellant trustee.

Carter, Ledyard & Milburn, of New York City (William F. Taylor, of counsel), for appellants Metropolitan Life Ins. Co. and others.

Charles E. Rushmore, of New York City (George N. Hamlin, of New York City, on the brief), for defendants Reed and Gardiner.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1] The first question arises under the plaintiff's appeal and brings up the meaning and validity of the "no recourse" clause. The plaintiff's idea that the stockholders' liability is not an obligation founded on the bonds, but only on the statute, seems to us verbal and scholastic. The statute is a necessary factor of the obligation, to be sure; but the obligation is none the less to pay the debt created by the bonds. If more words than are in article 22 of the mortgage are necessary to comprise such an obligation, we do not know where they could be found. Indeed, the only just criticism of the article is

that its verbiage, by including so much, opens ground for suspicion. Such instruments frequently suffer from that defect; but the intent, though it could have been put in a few lines, is not lost in spite of the conventional redundancy of its expression. The meaning is so clear that the only question which can arise is whether it is against public policy, whether the clause extends to the bondholders as well as to the mortgage trustee, and whether the supposed deceits affect the situation.

We can see no reason for saying that such a provision is against public policy if the bondholders were properly apprised in advance, and no authority is suggested even remotely in point. The theory of such liabilities is that the capitalization of a company conveys a belief that it starts with an equal value in property. That theory may be questionable in fact; but, assuming it to be true, it has no application when the creditor knows how the stock was issued before he lends his money. This is the law of Missouri (Woolfolk v. January, 131 Mo. 620, 33 S. W. 432; Trust Co. v. McMillan, 188 Mo. at p. 567, 87 S. W. 933, 107 Am. St. Rep. 335; Biggs v. Westen, 248 Mo. 333, 154 S. W. 708) under which the plaintiff sues. The provision is only intended to protect against deception, and there is no apparent reason to deny the right to creditors to say in advance that they will not rely upon it. Such covenants have been held valid whenever they have been tested, so far as we have found. Brown v. Eastern Slate Co., 134 Mass. 590; Fidelity Trust Co. v. Washington, etc., Corporation (D. C.) 217 Fed. 601.

The business of selling corporate bonds is not obviously affected with a public interest, as are such businesses as those of common carriers. While it is true that such bonds are sold broadcast to large numbers of people, they are generally distributed originally to bankers or brokers in large blocks, and in such cases it is the custom of the latter to familiarize themselves with the mortgage and its provisions. The final purchasers are their customers, and look to, and depend upon, these distributors, and not upon the obligors. The case is not, therefore, one where the obligor deals directly with a numerous class, not accustomed to look carefully at the details of the bargain, and where the detailed provisions of the contract are submerged by the urgency of the demand. It may well be that these distributors do not pay such attention to the details as they should, yet the matter is one in which they have an interest to protect the eventual customer, and where, if they do not, they are themselves affected by the result. An investor can hardly be put in the class of those not responsible for the clear meaning of the instruments on which he buys; at least, if it is so, we have no means of knowing it, and the matter must await some legislative determination.

[2] The plaintiff resorts, therefore, to the fact that the bonds did not incorporate the limitation, except by reference to the mortgage. Yet it has always been held that such a reference makes the provisions of the mortgage a part of the contract, as much in this case as in one where the instrument is prepared with the deliberate scrutiny of both sides. Natl. Salt Co. v. Ingraham, 122 Fed. 40, 58 C. C.

A. 356; McClelland v. Norf. S. R. Co., 110 N. Y. 469, 18 N. E. 237, 1 L. R. A. 299, 6 Am. St. Rep. 397; McClure v. Oxford, 94 U. S. 429, 24 L. Ed. 129. It would indeed be only a fictitious protection to insist that such provisions as this should be incorporated in the bonds. The investor who would read with so much care the whole of a bond so voluminous as it would become, were all the limitations included, would be as likely to look at the mortgage, if the bond referred to the mortgage. Buying such bonds is not like taking a bill of lading from a common carrier, an everyday incident of common affairs. Those who wish in any case to read the extended text carefully have now the power to go to the printed mortgage, and are as likely to do so as though the bond itself contained all its limitations. Certainly we may not say that such a company is under a public duty against which it may not contract by sufficiently explicit language.

Finally, the plaintiff says that at least as to the Mackay bonds the defendants are estopped by their misrepresentations from setting up the "no recourse" clause. Now, these alleged misrepresentations did not touch the existence of that clause in the mortgage; nor did they say that the stock had been issued for property worth its face, as in Downer v. Union Land Co., 113 Minn. 410, 129 N. W. 777. Such a statement would indeed have been absurd in the face of the fact that the bonds not only sold for less than par, but that the stock was given away as a bonus. They were general statements about the character of the property, its prospects, its value, and the extent of the title held by the company.

The plaintiff says that the defendants may not assert the clause because of these statements which constitute inequitable conduct. He wishes to use this misconduct by way of estoppel, and in that he fails, because estoppel never can do more than hold the utterer to the truth of his speech. If the rights of all the parties here are adjudicated upon the basis of the truth of the supposed deceits, it would not affect the stockholders' liability. They escape because they bargained to escape in advance, and no estoppel is relevant unless it comprises a statement that they had not so bargained. If they had sold the bonds on such a statement, they could not later take advantage of their exemption, but they did not. Nor did the defendants say that the stock was fully paid, though, if they had, it would not affect the covenant by which their liability as stockholders was waived. Downer v. Union Land Co., supra, is not to be so understood; the only point decided was that the covenant did not waive a liability for fraud and that an action of tort still lay. Finally, the general inequity of the defendant's conduct towards the Mackay group will not bar their assertion of a legal right in defense to the bill; they do not come into a court of equity, but are brought in. There is no rule of equity which takes from a defendant his legal defenses because his conduct has been inequitable. We therefore decline to consider the evidence of these supposed deceits or the extent to which the Mackay representatives were fully acquainted with the facts at the time they bought the bonds.

[3] However, while the stockholders are protected against any claim upon them as stockholders by the "no recourse" clause, that clause does not protect them as individuals, though they be stockholders, against the claims of persons who have been induced by them to buy bonds upon fraudulent statements. Yet it is only such defrauded purchasers, and not the trustee, who have the right to assert such a claim; the Mackay group may have its rights against some of the defendants, but they cannot assert them here. Such an effort was made in Slater Trust Co. v. Gardiner (C. C.) 183 Fed. 268, but failed. We have nothing to say as to the success or failure of such an action, if brought by the defrauded bondholders against those responsible for the utterance of the fraud. We only seek here to avoid a confusion between two separate matters: (1) The wrong done by deceit in selling the bonds; and (2) the obligation of the stockholders because of their acceptance of the stock.

This disposes of the main points in the plaintiff's appeal. The lesser points we consider at the end. The next question is of the defendants' appeal, especially as affecting Read and Gardiner. In this, the first question is of the value of the property. As to Gardiner, the proof is beyond question; he puts the outside value on the whole property at $4,000,000, which, while we do not accept it, is too little to save him against the claims allowed by the District Court. As to Read, assuming Gardiner did not speak for him, the mere situation shows the character of the undertaking. The total money expended in purchasing coal properties was $1,150,000, or about one-sixth of the capitalization. It is, of course, conceivable that the promoters got such a fabulous bargain as this; but how likely is it? Moreover, if it were such a good bargain and the coal remained, as it did, it is scarcely possible that it should lose so much of its value as never to be able to pay a dividend, though subsequently organized on about its cost basis. The sale value of coal thereabouts was not more than $20 per acre, and the necessary value to justify the capitalization was over $140. We may allow that consolidation into a single holding increased the value, but with what warrant may we say it increased the value sevenfold? Furthermore, we should be blind to the commonest facts of finance, if we allowed so transparent a disguise to pass muster. The constant effort to inflate capitalization so that the earnings shall not be too apparent could have no more characteristic an expression. That the incorporators honestly supposed that the property had a value beyond its bonded indebtedness we are quite willing to admit, but that they thought the stock at the time worth par passes belief. Their expectations did not constitute property until they could put them into the realm of such established certainty as would lead men generally to share them. The mere fact of the distribution of the stock as bonus demonstrates that they had not got so far as that.

[8] The defendants' calculations of value were properly characterized by the District Judge as the merest speculation, and even then at the expense of the most commonplace actuarial theory. The peg to hang them on is the testimony that royalties are the "basis" of cal-

culating value. Doubtless they are, but not upon the present full value of royalties payable a century hence. "Value" is what the thing will bring to-day in exploitation or exchange under some presently possible conditions. It has often been the custom in excessive capitalizations to try to justify watered stock issues by the statement that the value to the incorporators is such and such, greatly in excess of what they paid. That may or may not be true, according as the combination had enhanced the economic efficiency of the units, or as it results in the control of the market or the like. Some properties cannot be successfully sold; they are too big to have a genuine market. This perhaps was one, and perhaps its fairest measure of value lay in future exploitation; but just in so far as that exploitation involved the future it was subject to the discount of the future, even after the promoters' confidence became shared by the public. Moreover, to suppose that these coal lands were so little subject to competition that one could buy them at one-seventh of their value is wholly unwarranted. The region was known, it was being freely exploited already, it was no secret El Dorado; if the lands had any such value in combination, it is not possible that the demand for them should not have created a higher price. Judge Mayer was therefore certainly right in finding that, whatever its value, the property as a whole was not worth more than $6,600,000. That was all he need find.

[4, 5] The next question is of the defendants' liability as stockholders. The only statutory provisions in Missouri touching stockholders' liabilities, even indirectly, are that which requires stock to be issued for money, labor or property (Const. art. 12, § 8; Rev. St. 1909, § 2981), and that which allows execution directly against a stockholder upon a judgment against a corporation (R. S. 1909, § 3004). Stock issued for property is quite valid, and as between the corporation and the stockholder the agreement is conclusive. Like other courts in a similar situation, however, the Missouri courts have construed this constitutional provision not to justify all bargains which the stockholders collectively under the corporate name may choose to make with some of their number. The question came up first in the Supreme Court of Missouri in Schickle v. Watts, 94 Mo. 410, 7 S. W. 274, a case which, however, involved an Illinois corporation, and which could not therefore rule definitively upon the effect of the Missouri statutes. Next came Woolfolk v. January, 131 Mo. 620, 33 S. W. 432, in which the case was treated as though the stockholders' liability depended only upon his contract, and in which, since no bad faith was shown, he was exonerated. The basis of the liability where there was bad faith was not considered, but the dictum in Schickle v. Watts, supra, was overruled. After Woolfolk v. January, supra, came Van Cleve v. Berkey, 143 Mo. 109, 130, 44 S. W. 743, 42 L. R. A. 593, a case turning, like Schickle v. Watts, supra, on the liability of an Illinois stockholder. Nevertheless the discussion covered the Missouri law at length and held that the "American trust doctrine," as it was called, was "reinforced" by the Constitution and statutes of Missouri. Finally, Berry v. Rood, 168 Mo. 316, 67 S.

W. 644; Id., 209 Mo. 662, 108 S. W. 22; Id., 123 S. W. 888, 225 Mo. 85, was a decision squarely in point and went upon the theory that the result followed from the statutory law, though just how was not very clearly shown. The theory was repeated in Bank v. Rockefeller, 195 Mo. 15, 54, 55, 93 S. W. 761. Berry v. Rood, supra, is concededly the established law of the state to-day, whatever the source of the doctrine.

The defendants' distinction is no doubt real between collecting a partly paid subscription and assessing stock which has been paid in property. In the first case, the stockholder may be held in contract, although it may be necessary to set aside a subsequent fraudulent release to do so. In the second case, his sole promise is to convey specified property in exchange for the stock. If for any reason that contract, being voidable, is rescinded, the rescission would result in leaving no promise to do anything. Obviously, therefore, if the right against the stockholder is to sound in contract, no rescission theory will serve; any obligation over and above the conveyance of the property must be the mere creation of appropriate power. The defendants concede that if the property is consciously overvalued such an obligation arises; but they say that this obligation necessarily depends upon "general law," and that by similar reasoning, when the obligation is urged to depend upon unconscious overvaluation, it must equally depend upon an interpretation of "general law," as to which the decisions of the Missouri courts do not bind a federal court. Yet, however the Missouri courts might have founded the obligation, there can be no doubt that they in fact did found it upon the provisions of their Constitution and statutes requiring the stock to be paid for in property. From those provisions they thought it followed that the property must actually equal the face of the stock, regardless of what the stockholders honestly thought; and that, when it did not, their obligation to pay the difference arose from the fact that they had attempted an evasion of the statute. Their innocence of intent to violate the statute was not thought relevant, as it often is not. To succeed, the defendants are obliged to take the position that, while the Missouri courts were truly enough interpreting their Constitution when they held that it required payment in property of the actual value of the stock, they were relying upon "general law" when they created out of that interpretation an obligation coextensive with the violation of the statute. Such a distinction seems to us wholly factitious; it is not suggested in the opinions of the judges and presupposes a subtlety not to be expected. When in Van Cleve v. Berkey, supra, and Rood v. Berry, supra, the Supreme Court of Missouri repudiated the rule of Woolfolk v. January, supra, they clearly intended to establish a new rule dependent upon the public policy of Missouri as it was expressed in its positive enactments. This is what they said and, we must take it at its face. Of course, it cannot matter that the obligation was not expressly enacted in the statutes; we have nothing to do with the meaning which a state court chooses to impose upon any set of words, so long as we once are assured that they are engaged in finding that meaning. Any other canon would

inevitably involve a federal court in the necessity of ascertaining how far the state court is justified in finding the meaning, which they do find, from what they select as conveying that meaning. It is the very purpose of the rule to avoid such scrutiny, and to treat the positive enactments of a state as composed in part of the meaning which the state's authoritative interpreters choose to place upon them.

The authorities cited in support of the position that we are not bound by the state cases are all distinguishable. It is settled, for instance, that state decisions are not conclusive when they first are made after the rights of the parties become fixed. Great Southern Fire Proof Hotel Co. v. Jones, 193 U. S. 532, 24 Sup. Ct. 576, 48 L. Ed. 778; Adelbert College v. Wabash R. R. Co., 171 Fed. 805, 96 C. C. A. 465, 17 Ann. Cas. 1204. This is the basis of the decision in Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88, so far as it touches the state decisions, since it cites Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359, which distinctly asserted the doctrine. As the whole transaction in the case at bar occurred after Berry v. Rood, supra, the defendants can take no advantage from those cases. There is another doctrine, not so well settled, that where a state court decides that a state statute merely intends to re-enact the common law, and then sets forth its own notion of what the common law is, a subsequent federal court is still free to form its own decision as to the common law, notwithstanding the statute. This is indicated anyway, if not decided, in Byrne v. Kansas City Ry. Co., 61 Fed. 605, 9 C. C. A. 666, 24 L. R. A. 693. If once it is apparent, however, that the state court founds its decision upon the statute, even though the federal court has decided precisely the same question directly the contrary, it will none the less follow the state decisions. Bucher v. Railroad Co., 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795. Taylor v. Cummings, 127 Fed. 108, 62 C. C. A. 108, expressly declined to pass upon the question whether the federal court is bound, when the state decisions purport to construe a state statute contrary to the common law of which it appears to be the enactment. Casserleigh v. Wood, 119 Fed. 308, 56 C. C. A. 212, did indeed disregard the decisions of the courts of Colorado, but so far as appears they were all made after the rights of the parties were fixed, and therefore fall within Burgess v. Seligman, supra. It is fair to say that this distinction is not taken in the case, and in so far as the opinion goes further than the facts, with great respect, we cannot follow it. As to Mutual Life Ins. Co. v. Lane (C. C.) 151 Fed. 276, affirmed 157 Fed. 1002, 85 C. C. A. 677, the state decision (Union Fraternal League v. Walton, 109 Ga. 1, 34 S. E. 317, 46 L. R. A. 424, 77 Am. St. Rep. 350), which preceded the assignment of the insurance policy, is somewhat ambiguous, but seems to turn upon the theory that the state statute did not affect to change the common law. The second state decision (Rylander v. Allen, 125 Ga. 206, 53 S. E. 1032, 6 L. R. A. [N. S.] 128, 5 Ann. Cas. 355) was rendered after the rights were fixed. These are the only cases which need discussion.

We feel no hesitation in finding, therefore, that when a state court, by a decision before the critical facts occur, has purported to find in a state statute language which is not intended merely to re-enact the common law, we are conclusively bound, whatever our own judgment as to the propriety of their interpretation. We do not suggest what the rule should be if the decision finds the statute intended only to be declaratory of the common law and then determines what is the common law. In Van Cleve v. Berkey, supra, the language may, under this rule, be thought ambiguous, since the word is "reinforced," as already mentioned, though we interpret even this as going further than a mere declaration of common law; but no one can read Berry v. Rood, supra, without being satisfied that the court supposed itself to be construing the positive enactment of a policy peculiar to, or, if not peculiar, at least deliberate with, the state of Missouri. The Circuit Court of Appeals for the Eighth Circuit, in Mudge v. Black, 224 Fed. 919, 140 C. C. A. 397, took the same view of the same decisions, though the case involved bonds instead of stock subscriptions.

[6] The next question in the defendants' appeal is the right of the trustee in bankruptcy to sue. This is a question wholly of state law as well, depending upon whether the liability created by the statute is regarded as running towards the creditor individually or towards the corporation. Thus in New York, where it is well settled that the liability is personal to the creditor, the trustee may not sue (Re Jassoy Co., 178 Fed. 515, 101 C. C. A. 641), and the same is true of Minnesota (Courtney v. Georger, 228 Fed. 859, 143 C. C. A. 257). Yet in New Jersey (Re Remington Automobile Co., 153 Fed. 345, 82 C. C. A. 421) and in Ohio (Kiskadden v. Steinle, 203 Fed. 375, 121 C. C. A. 559), the obligation runs to the corporation and passes to the trustee. In general, all the incidents of the obligation are to be found in the decisions of the state courts, which interpret the statute. Converse v. Hamilton, 224 U. S. 253, 32 Sup. Ct. 415, 56 L. Ed. 749, Ann. Cas. 1913D, 1292. This stops any inquiry in the case at bar beyond the Missouri decisions. In Berry v. Rood, supra, 168 Mo. 335, 67 S. W. 644, stockholders' liabilities were distinctly treated as a part of the corporate assets, and a receiver was allowed to sue. In Biggs v. Westen, 248 Mo. 333, 154 S. W. 708, while the trustee in bankruptcy was not successful, it is apparent (248 Mo. 343, 344, 154 S. W. 708) that his failure did not turn upon his incapacity to sue. The court below had disallowed the claim of one creditor, but had given a decree sufficient to cover all the claims allowed. It was not suggested that the trustee was not the proper party to sue upon such claims; the implication is to the contrary. We do not doubt that this is the law of Missouri, and we are not concerned with the validity of its underlying theory. Nevertheless it is less anomalous than the defendants seem to suppose. That the corporation while solvent should not be able to sue on such liabilities might well be true, because they were subject to a condition that the corporate assets should be first exhausted. There is nothing any more anomalous in superadding to an illegal subscription for stock a liability in favor of the corporation to pay more

than you agree to pay, than there is in setting aside a release of an existing contract of subscription.

There remain some incidental matters for determination. The plaintiff's claim of a joint liability we pass, as it is stated in his brief to be of consequence only in case the bondholders be allowed to recover. The question of the liability of the other stockholders than Read and Gardiner we likewise pass, because it appears in the motion papers which were filed when the case was argued that the defendants have deposited sufficient cash to pay the whole amount of the judgment, which we are to affirm. Had the defendants Read and Gardiner appealed from that part of the judgment exonerating these other stockholders, or had the bondholders been allowed in to recover, the question would have been relevant to our decision. The defendants Read and Gardiner do not, however, ask to throw any part of the decree upon the stockholders exonerated, and the plaintiff has no interest in the incidence of the loss so long as he gets his money which is already assured to him.

[7] We see no reason to disturb the finding of the District Judge regarding the costs under the supplemental bill. A trustee in bankruptcy, when he sues a third person, takes the same risks as any other party. In the case at bar it is true that he is entitled to all the expenses of administration, but we do not think that the cost of prosecuting an invalid claim is a proper part of such expenses. It may be urged that, if the claim was reasonable, it is a hardship to put the trustee to his peril in suing upon it. We are not satisfied, if this were the test, that the probability of success was sufficient to justify the prosecution of the claim at the expense of the defendants; but, independently, it does not seem to us that in any case it is fair to call upon them to pay the expenses of an unsuccessful prosecution against them. Nor will we disturb the allowance to the defendants of costs on the supplemental bill.

There will be no costs on this appeal, but the disbursements will be divided one-half against the plaintiff and one-half against the defendants Read and Gardiner jointly. We do not understand that these defendants wish us to divide between them their half of these disbursements, nor do we see any occasion to dispose of the motion made at the outset of the argument.

The decree will be affirmed, with interest and without costs; the disbursements to be divided as above set forth.