WHITTLE v. VANDERBILT MINING & MILLING CO. et al.

(Circuit Court, S. D. California. September 14, 1897.)

No. 647.

1. TRUSTS—INNOCENT PURCHASERS OF TRUST ESTATE—CORPORATION ISSUING STOCK IN PAYMENT.
    The trustees of a trust for complainant's benefit conveyed the property, in violation of the provisions of the unrecorded trust instruments, to a corporation organized by them for that purpose only, and which issued to them in exchange nearly all its stock. In a suit to charge the trust on the land, held, that under Civ. Code Cal. §§ 869, 2243, relating to purchasers from trustees, the stock issued for the land constituted the corporation a purchaser for value.

2. CORPORATIONS—DEALINGS WITH STOCKHOLDER—NOTICE.
    A corporation purchased land from two persons, who held the record title, and also owned most of the corporate stock. No one representing it, except one of the grantors, knew that it was affected by an unrecorded trust instrument. Held, that as he was dealing for his own interest, and adversely to the corporation, his knowledge was not to be imputed to it, and that it was a purchaser without notice, under Civ. Code Cal. §§ 869, 2243.

3. WRONGFUL CONVEYANCE BY TRUSTEE—INNOCENT PURCHASER.
    The beneficiary of a trust in lands took no steps to enforce it for three years after notice, and never had the deeds recorded. The trustee wrongfully conveyed it to a purchaser for value and without notice. Held, that, as between him and the beneficiary, the latter should be the sufferer.

4. SAME—CORPORATIONS.
    In applying the principle that, as between two innocent parties, an injury effected by the wrongful act of a third party should be suffered by him whose negligence made the wrong possible, the court may look behind the corporate character of the other party, and take notice of the fact that an individual who has bought its stock is a real party in interest.

5. TRUST DEEDS—ACKNOWLEDGMENT AND RECORDING.
    Although an instrument charging a trust upon lands in California be unacknowledged, yet it may be recorded upon proof of its execution. Civ. Code Cal. §§ 1161, 1183, 1195, 1198, 1199.

6. SAME—IMPUTED NEGLIGENCE.
    If an instrument creating a trust in lands cannot be recorded for want of an acknowledgment, this defect, as due to the negligence of the creator of

the trust, is imputable to the beneficiary, and does not excuse the failure to record it, as against a purchaser for value and without notice.

**7. FRAUD OF TRUSTEE—RIGHTS OF BENEFICIARY.**

Where trustees wrongfully convey lands to a purchaser for value and without notice, the beneficiary may recover from the trustee the consideration received by him.

**8. CORPORATIONS—SUIT TO CHARGE A TRUST ON LANDS—PROCEDURE.**

In a suit to charge a trust on lands of a corporation, and for a receivership, and an accounting by individuals, the land was held to be free from the trust. Numerous creditors intervened and proved their claims against the corporation, and receiver's certificates required payment. *Held* that, while an accounting by the individual defendants should be decreed, this need not delay the sale of the property, and its application to pay the certificates and debts.

Clarence A. Miller and Miller, Wynne & Miller, for complainant.

W. J. Hunsaker and Wm. Chambers, for defendants.

H. C. Dillon, for receiver.

Gardiner, Harris & Rodman, Anderson & Anderson, Hatch, Miller & Brown, and E. R. Annable, for interveners.

WELLBORN, District Judge. This is a suit in equity for the enforcement of a trust and an accounting thereunder. The admissions of the pleadings, together with the evidence adduced orally in open court on final hearing, show the following facts:

On the 21st of March, 1892, Samuel King, R. C. Hall, and James K. Patton were the owners of eight mining claims, situated in the Vanderbilt mining district, California, described as follows: The "Gold Bar," the "Gold Bar Extension," the "Gold Bronze," the "Gold Bronze Extension," the "Eighty-Foot Claim," the "Chippy," the "Lookout," and the "Valley." On that day said King, being ill and in expectancy of early death, conveyed his undivided one-third interest in said mines to said James K. Patton and Joseph P. Taggart; and at the same time said Patton and Taggart executed two instruments, of the same tenor and effect (Patton executing one, and Taggart the other), describing said Patton and Taggart as "parties of the first part," and said King as "party of the second part," and containing, among other provisions expressive of the consideration for said conveyance, the following:

"In case of said second party's death before any reconveyance to him as herein provided, said first parties agree to account to the nephew of said second party, named, to wit, Henry King Whittle, for the gross profits or proceeds (whether derived by sale, working, or otherwise) of one-half (½) of said one-third interests in said mines; it being understood that first parties will pay all expenses connected with the working and care of said mines, and will not charge said expenses, or any proportion thereof, against the said gross proceeds to go to said Henry King Whittle as aforesaid."

Samuel King died April 2, 1892, without any reconveyance of said mines having been made to him. Within a few days thereafter the above facts were communicated by mail to the mother of complainant, Mrs. F. L. Whittle, at Birmingham, Ala., in a letter written by Diehl & Chambers, attorneys at law, then representing said Joseph P. Taggart and James K. Patton; and afterwards, about the month of March, 1893, other parties wrote to complainant, with a view of purchasing

his interest in said mining properties. On the 8th day of February, 1893, said Hall, Patton, and Taggart, pursuant to a sale previously made, conveyed to one William S. Lyle the Gold Bar and Gold Bar Extension Mines, receiving as the consideration therefor the sum of $40,000; and afterwards, on the 21st day of February, 1893, said Hall, Patton, and Taggart conveyed the said Eighty-Foot Claim to said William S. Lyle, receiving as the consideration therefor the sum of $300. Between April 3, 1892, and February 25, 1893, said Hall, Taggart, and Patton, and after said last-mentioned date, and until the 27th day of December, 1893, said James K. Patton and Joseph P. Taggart, extracted from said mines minerals and ore, from which the bill alleges said Joseph P. Taggart and James K. Patton received more than $50,000. Said Patton and Taggart deny that they received from said sources any sum greater than $20,000, and allege that said $20,000 was all used in paying the expenses of mining, shipping, and selling said ore. Afterwards, and prior to the 27th day of December, 1893, the legal title to two of the above-mentioned mines, the Gold Bronze Mine and the Gold Bronze Extension Mine, became vested in James K. Patton and Annie M. Taggart (wife of Joseph P. Taggart), subject, however, to whatever equitable rights complainant may have at any time theretofore had in the mines. The legal title so vested in Annie M. Taggart was merely nominal; her husband, Joseph P. Taggart, being the real owner. On said last-mentioned date said Patton and Annie M. Taggart conveyed said mines to the Vanderbilt Mining & Milling Company, a corporation organized under and by virtue of the laws of California by James K. Patton and Joseph P. Taggart for the sole purpose of aiding them in the management of said mining property, with a capital stock of 1,000,000 shares, of the par value of $1 each, owned at the date of the aforesaid conveyance to said company as follows: James K. Patton, 499,998 shares; Annie M. Taggart, 499,998 shares; Henry T. Hazard, 1 share; William Chambers, 1 share; Samuel T. Godbe, 1 share; Henry C. Dillon, 1 share,— the directors of said corporation being James K. Patton, Annie M. Taggart, Henry T. Hazard, William Chambers, and Samuel T. Godbe. Joseph P. Taggart was the real owner of the shares standing in the name of Annie M. Taggart. William Chambers was an attorney at law, and a witness to the instrument or declaration of trust executed by Joseph P. Taggart, and a member of the firm of Diehl & Chambers, hereinbefore mentioned. The bill, among other things, alleges:

"That the said Anna M. Taggart, Henry T. Hazard, William Chambers, and Samuel T. Godbe at the time of said conveyance were not bona fide stockholders and directors in said corporation, and that they had no interest therein, but were only nominal stockholders and directors therein for the purpose of carrying out the plans and subserving the individual interests of the said Joseph P. Taggart and said James K. Patton, and had no interest in the management and conduct of the affairs of said corporation, except as the implements of the wills of said Joseph P. Taggart and James K. Patton, and that all of said directors at the time of the execution of said deed were entirely governed and controlled by the said James K. Patton and Joseph P. Taggart for the accomplishment of their individual purposes, and that all of the contracts, acts, and things leading up to, and forming a part of, the agreement and conveyance of said property and mining claim to said Vanderbilt Mining & Milling Company,

were done, performed, and carried out by said James K. Patton and Anna M. Taggart (who, as your orator is informed and believes, was but the agent and instrument of said Joseph P. Taggart) as the managing agents and directors of said Vanderbilt Mining & Milling Company."

The bill alleges also that the conveyance by defendants Patton and Taggart to the said Vanderbilt Mining & Milling Company was without consideration, and that said company accepted said conveyance with full knowledge of the interest of the complainant in the property so conveyed. The answer of said corporation is silent as to the allegation that the conveyance was without consideration, but expressly alleges:

"That said corporation never had any notice of the equities or contracts of the complainant herein, or that said complainant had any claim in or to or upon said mining property, or in the production of the same, until this action was brought."

After said two last-mentioned mines were conveyed to the Vanderbilt Mining & Milling Company said corporation proceeded with and continued the working of said mines, until the appointment of the receiver herein, June 15, 1895. During the time that said company was engaged in working the mines, it incurred large indebtedness; and its creditors, none of whom are shown to have any notice of complainant's claims upon said mines, have intervened, asking sale of the company's property, and distribution of the proceeds among themselves according to their respective priorities. The creditors so intervening, with the amounts of their debts and dates of their liens, are as follows: John Hughes, $818.23. Alexander McKenzie, $381.-08. Ned Kinney, $53.75. Thomas Phillips, $148.85. James P. Cummings, $79.50. John Phillips, $91.47. S. L. Ferguson, $1,187.96. John Hopkins, $384.98. (The last eight named parties having laborers' liens, which date from January 10, 1894, and were foreclosed in one action, October 22, 1895, in the county of San Bernardino, state of California; the costs of the action being nine dollars.) A. J. Boone, $286; costs, $17, with laborer's lien from February 10, 1894, and foreclosed April 11, 1895; Hall & Stillson Company, a corporation, balance due, $5,325.86; judgment obtained in the superior court of the county of San Bernardino, Cal., on June 15, 1895, with judgment lien from June 15, 1895. R. S. Seibert, $1,347.41; costs, $10; judgment obtained in the superior court of the county of Los Angeles, Cal., on July 20, 1895; the lien thereof fixed by record of transcript in San Bernardino county, Cal., August 1, 1895. Arthur Woods, $4,892.89; costs, $7; judgment recovered in the superior court of the county of Los Angeles, Cal., on July 31, 1895; lien thereof fixed by record of transcript in the county of San Bernardino, Cal., August 3, 1895. Charles Kelly, $221.50; costs $6; judgment recovered in the justice's court of Needles township, San Bernardino county, Cal., on November 14, 1895; the lien thereof fixed by record of judgment in the county recorder's office of said San Bernardino county March 20, 1896. There is also a petition in intervention, filed by Jones Taylor May 1, 1897, resisting the trust, which complainant seeks to enforce against the Vanderbilt Mining & Milling Company. Said Taylor is the owner of 500,001 shares of the stock of said company, one-

third of which he purchased in April, 1894, and the balance in the fall of the same year, paying for the same $25,000. As to whether or not he knew at the times of his purchases of the contract between Samuel King and Joseph P. Taggart and James K. Patton, there is a conflict between the testimony of Taylor and Taggart. I am satisfied, however, that Taylor did not, when he purchased the stock, have any knowledge whatever of said contract. The expenses of the receiver herein have been met in part by certificates of indebtedness issued by the receiver under an order of court made March 28, 1896, which authorized certificates to the amount of $1,153.72 for the payment of the expenses of the receivership up to that date, and certificates to the amount of $100 each month thereafter for the care and protection of the property, and which contains the following provision with reference to said certificates:

"They are hereby made and declared to be a first lien upon all of the real and personal property of the defendant company in the charge and possession of said receiver, and in litigation in this cause, and more particularly mentioned in the receiver's inventory on file herein."

1. The main issue, if not the only controverted matter, in the case, is as to whether or not the legal title to the two mines conveyed to the Vanderbilt Mining & Milling Company is held by said company absolutely, or partly in trust, to account to complainant for one-sixth of the gross profits or proceeds of said mines. Complainant insists that the conveyance of said mines to said company was in violation of the trust created by the contract between Samuel King and Joseph P. Taggart and James K. Patton, and was not made in good faith, nor for a valuable consideration, and, therefore, that the case falls within the provisions of section 2243 of the Civil Code of California, which is as follows:

"Sec. 2243. Every one to whom property is transferred in violation of a trust holds the same as an involuntary trustee under such trust, unless he purchased it in good faith and for a valuable consideration."

Defendants, on the other hand, contend, among other things, that the Vanderbilt Mining & Milling Company was a purchaser without notice, and for a valuable consideration, and, therefore, that the conveyance to said company must be deemed absolute, as provided in section 869 of the Civil Code of California, which is as follows:

"Sec. 869. Where an express trust is created in relation to real property, but is not contained or declared or declared in the grant to the trustee, or in an instrument signed by him, and recorded in the same office with the grant to the trustee, such grant must be deemed absolute in favor of purchasers from such trustee without notice and for a valuable consideration."

Thus it will be seen that the questions here involved are two: First. Was the conveyance of said mines to said company made upon a valuable consideration? Second. Was said company a purchaser without notice? While it is true that the bill alleges in terms that said conveyance was entirely without consideration, yet the facts, as alleged in the bill, connected with said conveyance, and which are determinative of its character, namely, that the Vanderbilt Mining & Milling Company was organized by Joseph P. Taggart and James K. Patton solely for the management of said mines, and did not acquire

any others, and that said Taggart and Patton were the real owners of the entire capital stock of said corporation at the time when said conveyance was made, show clearly that there was a consideration for said conveyance, and that such consideration was the capital stock of said Vanderbilt Mining & Milling Company.    I am also satisfied, from a careful review of the authorities applicable to the undisputed facts of the case, that said company at the time of the conveyance to it of said mines was without knowledge of any trust as to said property which may have theretofore existed in favor of complainant.    On this question of knowledge or notice, complainant contends that no issue is raised by the pleadings, and cites Stokes v. Geddes, 46 Cal. 18.    That case, however, is clearly distinguishable from the case at bar.    There the suit was against the sheriff and the purchaser at an execution sale, to set aside the attachment, execution, and sheriff's certificate of purchase in an action to enforce the lien for delinquent taxes.    Among the other grounds of equity set forth in the complaint, it was alleged:

"That until within a few weeks before the commencement of this action the plaintiff had no notice of the pretended assessment, or of the pendency of proceedings in the tax suit; and, on information and belief, he avers 'that no notice was given of said proceedings, or any of them, as required by law.' "

Manifestly, the allegation "that no notice was given of said proceedings, or any of them, as required by law," was not an averment of a fact, but of a conclusion of law; and so the court held.    In the case at bar, however, the situation is wholly different.    Whether or not the Vanderbilt Mining & Milling Company had knowledge or notice of complainant's claims is evidently an issue of fact, and, I think, squarely raised by the pleadings.    Did said company, then, or not, have this knowledge or notice?    There is no proof whatever that Hazard or Godbe, who were two of the company's directors, knew anything about the contract between Samuel King and Joseph P. Taggart and James K. Patton.    Nor is there any proof that Annie M. Taggart, also a director, knew of the terms or existence of said contract, while her answer specifically denies any knowledge on her part of the matter.    Complainant's contention, therefore, that said company had such notice, is maintainable only on the theory that the knowledge of Patton and Chambers, the other directors, is imputable to the company.    Numerous authorities are cited by complainant to the effect that notice to the agent of a corporation is notice to the corporation.    Phelps v. Mining Co., 49 Cal. 337; Jefferson v. Hewitt, 103 Cal. 629, 37 Pac. 638; Donald v. Beals, 57 Cal. 405.    While this, unquestionably, is the general rule, yet it has no application where the officer or agent of the corporation deals with the corporation, for himself, personally.    In such a case he is regarded as a stranger to the corporation, so far as concerns any uncommunicated knowledge which he may have in respect to the transaction.    4 Thomp. Corp. §§ 5205, 5206; Frenkel v. Hudson, 82 Ala. 158, 2 South. 758; Johnston v. Shortridge, 93 Mo. 227, 232, 6 S. W. 64; State Sav. Ass'n v. Nixon-Jones Printing Co., 25 Mo. App. 643; Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282; Bank v. Chase, 72 Me. 226; Wickersham v. Zinc Co., 26 Am. Rep. 784; Mathis v. Pridham (Tex. Civ. App.) 20 S. W.

1015; Manhattan Brass Co. v. Webster Glass & Queensware Co., 37 Mo. App. 145. In Frenkel v. Hudson, supra, the court says:

"The general rule is that notice of a fact acquired by an agent while transacting the business of his principal operates constructively as notice to the principal. This rule applies, of course, as well to corporations as to natural persons. Reid v. Bank, 70 Ala. 199. It is based upon the principle that it is the duty of the agent to act for his principal upon such notice, or to communicate the information obtained by him to his principal, so as to enable the latter to act on it. It has no application, however, to a case where the agent acts for himself, in his own interest, and adversely to that of his principal. His adversary character and antagonistic interests take him out of the operation of the general rule, for two reasons: First, that he will very likely in such case act for himself, rather than for his principal; and, secondly, he will not be likely to communicate to the principal a fact which he is interested in concealing. It would be both unjust and unreasonable to impute notice by mere construction under such circumstances, and such is the established rule of law on this subject."

In Innerarity v. Bank, supra, the rule is stated thus:

"While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating."

In yet another case the same doctrine has been enunciated thus:

"The general proposition is undoubtedly true, that notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency. The rule is based on the presumption that the agent has communicated such facts to the principal. Story, Ag. § 140. On principles of public policy, the knowledge of the agent is imputed to the principal. But the rule does not apply to a transaction such as that under consideration; for in such a transaction the officer, in making the sale and conveyance, stands as a stranger to the company. Stratton v. Allen, 16 N. J. Eq. 229. His interest is opposed to theirs, and the presumption is, not that he will communicate his knowledge of any secret infirmity of the title to the corporation, but that he will conceal it. Where an officer of a corporation is thus dealing with them in his own interest, opposed to theirs, he must be held not to represent them in the transaction, so as to charge them with the knowledge he may possess, but which he has not communicated to them, and which they do not otherwise possess, of facts derogatory to the title he conveys." Barnes v. Gaslight Co., 27 N. J. Eq. 36.

It is true that some authorities seem to suggest a distinction between the knowledge of a director who, though personally interested, also represents the corporation, and the knowledge of a director who only acts for himself, the corporation being represented by other directors or agents. Bank v. Christopher, 40 N. J. Law, 437. This distinction, however, I think, is not well founded. The reason, as shown by the last two extracts above quoted, why the knowledge of a corporate director, relating to a transaction with the corporation, in which he is personally concerned, and acts for himself, will not be imputed to the corporation, is that his adversary interests are such that he will not be likely to communicate to the corporation a fact which he is thus interested in concealing. This reason applies as strongly when the interested director acts for the corporation as when he does not so act, and therefore the cases are indistinguishable.

The following illustrations seem to be specially applicable to the case at bar:

"When, therefore, the president of a corporation, acting in his own interest. conveys land to the company in payment of his stock subscription, the company is not affected with notice of any equities affecting the title to the land of which the president may have knowledge. In such a case the knowledge of the president is not the knowledge of the company, because the president is acting in a character adversary to the company, and in his own interest. So. where the general superintendent of a corporation conveyed to it, with warranty, lands which he had purchased in his own interest, and which were subject to a lease executed by a prior vendor, of which the superintendent had actual notice when he purchased, and which was recorded, but not acknowledged and certified as required by law, it was held that the knowledge of the superintendent could not be imputed to the corporation." 4 Thomp. Corp. § 5207.

It is true that Chambers was not one of the grantors in the conveyance to the company, but the bill alleges that he was a mere agent and "implement of the wills" of Joseph P. Taggart and James K. Patton in the accomplishment of their plans; so that, on this question of notice, Chambers stands in the same relation to the corporation as Patton. Their knowledge is not the knowledge of the corporation.

There is another view of the case, strenuously urged by defendants, which I think also bars the relief complainant seeks against the Vanderbilt Mining & Milling Company, and it is this: That since either complainant or Jones Taylor, both innocent persons, must suffer from the wrongful acts of Taggart and Patton, complainant should be the sufferer, since it was only through his negligence that said wrongful acts were possible of accomplishment. The doctrine which defendants here invoke is familiar, and in California has become a statutory enactment. Civ. Code Cal. § 3543. This rule was declared by Chief Justice Parker, of Massachusetts, as follows:

"It is a general and just rule that when a loss has happened, which must fall on one of two innocent persons, it shall be borne by him who is the occasion of the loss, even without any positive fault committed by him, but more especially if there has been any carelessness on his part which caused or contributed to the misfortune." Somes v. Brewer, 2 Pick. 201.

The same rule is enunciated by the supreme court of Pennsylvania thus:

"Where one of two innocent persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him ought to bear the loss." Mundorf v. Wickersham, 63 Pa. St. 87.

The supreme court of California, on the same subject, says:

"In this case, plaintiffs and defendant were both innocent. Neither knew that the fraud was being practiced: but, if that fraud was productive of injury, the injury must result to the plaintiffs, for they placed it in the power of the wrongdoer to perpetrate the fraud." Schultz v. McLean, 93 Cal. 357, 28 Pac. 1053.

Again, the same authority quotes with approval from Judge Story as follows:

" 'Whenever the equities are unequal, there the preference is constantly given to the superior equity.' See, also, Jeremy, Eq. Jur. 285, 286." Salter v. Baker, 54 Cal. 143.

There is no fact or circumstance in the case at bar that subjects Taylor to the criticism of having been negligent. When he bought

his stock he had no knowledge of the instrument or declaration of trust in favor of complainant, nor was there any circumstance to put him upon inquiry. On the contrary, there was everything to invite reliance on the title of the corporation. The conveyance of the property to the corporation was regular and valid. The corporation was in possession of, and working, the property so conveyed. I repeat, there was nothing to cause Taylor to suspect the existence of a secret or unrecorded trust. No negligence, therefore, can be charged against him. The case, however, is different with complainant. The trust in his favor came into existence April 2, 1892. Although promptly and fully advised of its existence, he took no steps for its enforcement until the commencement of this action, April 13, 1895,—a period of three years. During all this time the instrument which created the trust was left unrecorded. Complainant, in his brief, answers this latter suggestion by saying that "the instrument was not acknowledged, and could not have been recorded." This answer, however, is without force, since the instrument, although unacknowledged, could have been recorded, upon proof of its execution. Civ. Code Cal. §§ 1161, 1183, 1195, 1198, and 1199. Besides, if it were true that the instrument could not have been recorded, for want of an acknowledgment, still the failure to have it acknowledged was the negligence of the person through whom complainant derives his title, namely, Samuel King, and therefore the negligence is chargeable to complainant. From the facts above stated, it is obvious, that the wrongful acts of Taggart and Patton were accomplishable only because of complainant's negligence. Complainant further contends that the equitable rule above mentioned, namely, "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened must be the sufferer," cannot be invoked by Jones Taylor, for the reason that he was not the purchaser of the property from Taggart and Patton, but that the mines were conveyed to the Vanderbilt Mining & Milling Company, of which Taylor is but a stockholder. Defendants, in response to this, contend that, while it is ordinarily true that the rights of a corporation in any transaction to which it is a party are unaffected by the personal relations of its stockholders to such transaction, yet the doctrine is technical, and a court of equity will disregard it, and treat the corporation, not as an entity, but an association of persons, whenever justice between the parties so requires; citing Mor. Priv. Corp. § 231. As the section is brief, and its argument, to my mind, conclusive, I give it in full, as follows:

"Even in those cases in which only corporate rights and obligations are involved, and the corporation is nominally interested only as an entity, the courts are constantly obliged to consider that the real persons in interest are, the individual shareholders. This is especially true in dealing with the rights of creditors, and the obligations existing between a corporation and its shareholders by reason of their contract of membership. The courts of equity will often take notice of the real character and constitution of a corporation, in applying the doctrine of laches against persons asserting equitable claims against the company's property or assets. The shareholders in a corporation are undoubtedly bound by the corporate acts, and cannot set up their several equities against persons who have claims against the corporation; but the fact

that shares represent undivided interests in the corporate concern, and are freely transferable in the open market, passing from day to day into the hands of innocent purchasers, may be a good reason why persons having equitable claims, the enforcement of which would impair the value of the company's shares, should be diligent to assert their rights. Thus, if a corporation should obtain title to property through a fraud on the part of its agents, the rightful owner of the property would certainly be entitled to set aside the transfer, although innocent shareholders and creditors should suffer thereby, provided he was not guilty of inexcusable delay in asserting his rights; but any negligence or unexcused delay until innocent persons have acquired an equitable interest in the property, as shareholders or creditors of the corporation, would be a sufficient reason for refusing relief in a court of equity."

Manifestly, the equities of Jones Taylor are superior to those of the complainant, and, since the relief complainant seeks against the Vanderbilt Mining & Milling Company cannot be afforded without the destruction or impairment of those equities, such relief should be refused.

2. From the foregoing views it results that the complainant is entitled to judgment against the defendants Joseph P. Taggart and James K. Patton for one-sixth of the capital stock of the Vanderbilt Mining & Milling Company; said stock being the consideration received by said Taggart and Patton for the Gold Bronze and Gold Bronze Extension Mines. There is no dispute but that complainant is also entitled to judgment against the defendants Joseph P. Taggart and James K. Patton for one-sixth of $40,000, with interest from February 8, 1893 (said sum of $40,000 being the purchase price received by said defendants on the sale to William S. Lyle of the Gold Bar Mine and of the Gold Bar Extension Mine), and also for one-sixth of $300, with interest from February 21, 1893 (said sum of $300 being the purchase price received by said Patton and Taggart on the sale to William S. Lyle of the Eighty-Foot Claim), and also for one-sixth of the gross profits or proceeds realized by them from the working of the mines described in the bill of complaint, up to December 27, 1893, the date of the conveyance by Annie M. Taggart and James K. Patton of the Gold Bronze Mine and Gold Bronze Extension Mine to the Vanderbilt Mining & Milling Company, and to an accounting by Joseph P. Taggart and James K. Patton for such profits and proceeds.

3. The circumstances of the case manifestly require that the property belonging to the Vanderbilt Mining & Milling Company, now in the possession of the receiver, be sold, and the proceeds distributed among those entitled thereto. Since the intervening creditors are asking that said property be sold without further delay, and since the accounting to complainant by Joseph P. Taggart and James K. Patton for the gross profits or proceeds derived by them from the working of the mines described in the complaint, which accounting is the only undetermined matter herein, cannot in any way be affected by said sale, the receiver should proceed at once, in the manner prescribed by law, to advertise and sell said property at the courthouse of San Bernardino county, Cal.; the proceeds of such sale to be applied as follows: (1) To the payment of the expenses and charges of the receivership, including receiver's certificates. (2) To the pay-

ment of the intervening creditors in the order in which they have hereinbefore been named, except that the liens of the first eight of said crditors belong to the same class, and will be paid pro rata. (3) The balance or residue to be paid into the registry of this court, for such disposition as the court may hereafter direct.

Some questions other than those to which I have adverted were raised at the oral argument, and are also urged in the briefs subsequently filed. My rulings, however, already announced, render further notice of such questions unnecessary. A decree conformable to this opinion will be entered.