THE FIRST NATIONAL BANK OF CHANUTE, *Appellee,*
v. G. L. NORTHUP *et al., Appellants.*

No. 16,553.

### SYLLABUS BY THE COURT.

1. CORPORATIONS—*Liability of Stockholders—Shares Nominally Paid Up—Notice to Creditors.* Where at the time of the organization of a corporation stock is issued at a discount, less than par being received for shares that are nominally paid up, the company agreeing that no further payment shall be demanded, the ordinary rule is that the stockholder assumes a liability, so far as is necessary for the protection of creditors who have become such without notice of such arrangement, up to the point where his total contribution to the corporate funds equals the face value of his stock.

2. —— *Liability of Holders of Shares Issued for Property Worth Less than Face Value of Stock.* Where stock purporting to be fully paid up is issued in exchange for property that the parties to the transaction agree is worth a fixed amount, which is less than the face of the stock, creditors of the corporation have a right to look to the stockholder to the same extent as though he had obtained his stock by the payment in cash of the amount so agreed upon.

3. —— *Same.* Where the stockholders of a corporation agree that a new corporation shall be formed, to which shall be transferred a part of its property, in return for a division of the capital stock of the new company among the members of the old one, in proportion to their interest therein, and further agree that the property is worth a stated amount and that anyone not caring to receive stock shall be paid in cash on that basis, and this arrangement is carried out, the holders of stock so acquired are liable to corporate creditors to the

same extent as though they had paid cash therefor on the basis of such valuation.

4. ——— *Notice to Corporation—Knowledge of Officer Having a Personal Interest.* Where a bank has lent money to a corporation the stock of which is nominally but not actually paid in full, its right to look to the stockholders for repayment to the extent to which they have not paid the face value of their stock is not defeated by the fact that the president of the corporation, having a substantial pecuniary interest therein, was also the cashier of the bank, and acted for both parties in the negotiation of the loan, without communicating to any other officer of the bank his knowledge that the stock had been issued at a discount.

Appeal from Neosho district court; OSCAR FOUST, judge *pro tem.* Opinion filed June 11, 1910. Affirmed.

*H. P. Farrelly,* and *T. R. Evans,* for the appellants.
*James W. Reid,* and *John J. Jones,* for the appellee.

The opinion of the court was delivered by

MASON, J.: The First National Bank of Chanute obtained a judgment against the West Plant Oil Company, a corporation organized under the laws of Arizona. Not being able to realize upon the judgment otherwise, it sued a number of stockholders, basing its claim against them upon the ground that they had not paid to the corporation the face value of their shares. It obtained judgment against the defendants and they appeal.

The facts material to the questions presented, as found by the court, were these: The Kansas Vitrified Brick Company, a corporation capitalized at $50,000, had among its assets a number of oil-and-gas leases. Its members concluded that this property could be handled to better advantage by a separate company. They therefore organized the Arizona corporation for this purpose, taking out a charter fixing the capital stock at $1,000,000. The brick company transferred

to the oil company the property referred to, by an instrument reciting a consideration of $25,000, and the oil company in payment therefor issued all its stock to the shareholders in the brick company, in proportion to their respective holdings therein. The certificates for the stock thus issued recited that it was fully paid and nonassessable. The stockholders of the brick company agreed among themselves that the property so transferred was worth $25,000, and that any who did not care to accept stock in the new company should receive cash in lieu thereof on that basis. The oil company never received any other payments from its stockholders. Its actual invested capital was the property for which its stock was issued. It borrowed $10,000 from a bank which was afterward merged in the plaintiff bank, a new note being taken for the amount, which was the basis of the judgment sought to be collected in this action. The president of the oil company, being the owner of a substantial amount of its stock, was the cashier of the bank that lent the money and the president of the plaintiff bank when the renewal note was taken. In each capacity he engaged daily in the conduct of the banking business. He acted for each bank in these transactions, as well as for the oil company. He knew that the corporation's stock had not been paid for at its face value, but no other officer of either bank had knowledge of that fact.

The defendants claim that since their stock was issued as fully paid they owed the oil company nothing, and hence were not liable to its creditors for the payment of its debts; that if any such liability existed it could only be with respect to credit extended on the faith of the capitalization stated in the charter, and that the plaintiff's loan was not of that character, since the bank's officer, who was active in making it, knew all about the facts in the case.

Where at the time of the organization of a corporation stock is issued at a discount, less than par being

Bank v. Northup.

received for shares that are nominally paid up, the company agreeing that no further payment shall be demanded, the general rule is that so far as is necessary for the protection of creditors the stockholder assumes a further liability up to the point where his total contribution to the corporate fund equals the face value of his stock. (10 Cyc. 460, 461; 4 Thomp. Corp., 2d ed., §§ 3902, 3911; 1 Cook, Corp., 6th ed., §§ 42, 45; 8 L. R. A., n. s., 263, note.) Where the stock is issued for property, the authorities differ; some follow what has been called the "true value" rule—that is, that the creditors' rights are the same as though the corporation had received, instead of the property, its actual value in money; others adopt the "good faith" rule— that is, that in the absence of fraud the stockholder can not be held liable for any further payment, however greatly the property may have been overvalued. (10 Cyc. 473; 4 Thomp. Corp., 2d ed., §§ 3975, 3976.) The overvaluation, if gross, has been held to be evidence of fraud; if intentional, to be proof of it. (4 Thomp. Corp., 2d ed., §§ 3978, 3979. See, also, 42 L. R. A. 593, note; 23 C. C. A. 315, 326, 332-334, note; 1 Cook, Corp., 6th ed., § 46, and note 2, p. 165.) In the work last cited the modern tendency is represented as being against holding the stockholder liable, the author saying:

"During the past thirty years there has been a vast amount of litigation on this subject. The courts still disagree in their conclusions, but a careful study of the cases will show that upon authority as well as principle the stockholders can not be held liable in such a case. . . . This principle of law, that there is no liability on stock issued for property the value of which is less than the par value of the stock, seems a self-evident principle of law. Moreover, this principle is based on business usage and is sound practice. There is no more harm in the issue of stock below par than there is in the issue of a note or bond below par. The extent to which the courts have gone in sustaining such issues of stock for property is shown by the fact that even con-

stitutional and statutory prohibitions against watered stock have been practically construed away by the courts. Moreover, the laws of trade are more powerful than the laws of men, and in business circles it has become customary to capitalize property at a reasonably high figure. This is due to the fact that it is easier to sell stock at less than par than at par, and also to the fact that, by a large capitalization, dividends are kept low enough to avoid the cupidity of possible competitors and the interference of legislatures. To such an extent is this practice carried of issuing stock for property at an overvaluation that the investing public and persons who give credit to corporations rather expect it, and they no longer rely upon the nominal capitalization of the company. Experience has taught them that they must investigate the real financial condition of the company, and invest or give credit upon that alone." (1 Cook, Corp., 6th ed., § 46.)

In the present case, if we were required to apply the "good faith" rule, there would seem to be little difficulty in saying that the exchange of the property for a stock issue of $1,000,000 involved an overvaluation that was both gross and intentional. But the case is hardly one of overvaluation. The amount recited as the consideration for the transfer ($25,000) appears to have been the valuation fixed by the persons concerned. This is shown by the fact that the stockholders of the old company who preferred not to become members of the new one were to be paid out on that basis. The real transaction amounted to an agreement to issue stock at 2½ cents on the dollar, and the acceptance of the property in lieu of cash on those terms, at a valuation of $25,000. The contention of the defendants that their stock was in fact fully paid for must therefore fail.

Inasmuch as the holder of stock which is issued as fully paid owes nothing to the corporation (19 L. R. A., n. s., 115, note) any liability to creditors must be founded upon the theory that they have extended credit upon the faith of the nominal capitalization.

Consequently it is held that a creditor who at the time he becomes such knows the facts regarding the issuance of the stock, not being within the reason of the rule of liability, is not within its protection. (1 Cook, Corp., 6th ed., § 46, p. 188; 4 Thomp. Corp., 2d ed., § 3983; 8 L. R. A., n. s., 271, note; 10 Ann. Cas. 90, note; 23 C. C. A. 340, note.)

The defendants claim that since the cashier while acting for the bank in making the loan knew that the stock in the oil company had been issued at a discount, the bank itself must be deemed to have had that knowledge. A corporation in dealing with one of its own officers, who acts for himself and not for it, is not chargeable with notice of facts known to him. (2 Thomp. Corp., 2d ed., § 1655; 10 Cyc. 1063; 36 Am. Dec. 191, note.) The authorities are in substantial agreement upon this proposition, and upon the reasons for it, which are thus stated in *Wickersham v. Chicago Zinc Co.*, 18 Kan. 481:

"It is undoubtedly true, as a general proposition, that the principal is charged with the knowledge and bound by the acts of the agent; but this general rule, like most other rules, has its exceptions and limitations. The general rule is based upon the principle that, as it is the duty of the agent to act upon the notice for his principal, or to communicate the information to his principal in the proper discharge of his trust as such agent, notice to the agent is likewise legal notice to his principal. This rule applies to the agents and officers of corporations, as well as others. This general rule has no application, however, to a case in which the one party does not act as agent, but avowedly for himself, and adversely to the interests of the other. In other words, neither the acts nor knowledge of an officer of a corporation will bind it in a matter in which the officer acts for himself and deals with the corporation as if he had no official relations with it." (Page 486.)

It can make no difference in principle whether the officer of a corporation in dealing with it acts solely

for himself or as the agent for another company in which he holds stock. In either case his own interests are to some extent opposed to those of the corporation, which he is under a greater or less temptation to sacrifice. The rule of law can not be made to depend upon the extent of the officer's personal interest, so that it is substantial. In the present case, if the cashier had asked the directors to make the loan and they had done so on their own judgment, his interest in the oil company was sufficient so that the presumption would be that he did not tell them the stock had been issued at a discount, and his knowledge of the fact would not be imputed to the bank. But the cashier acted for the bank in this very transaction, either alone or in connection with other officers, so that in a sense the bank —that is, its active agent in the transaction—had actual knowledge of the situation, and this phase of the matter involves a different question. In the note last cited it is said:

"It will be noticed that in all these cases the corporate agent was not acting in his official character in the particular transaction. The fact of his agency was merely incidental. It is obvious that the same rule can not be applied where the agent acts officially upon a matter in which he has a personal interest, even though such interest is adverse to that of the corporation. In such cases it is his duty, notwithstanding his interest, to communicate to his company any facts in his possession, material to the transaction, and the law will therefore presume, in favor of third persons, that he made such communication. This, it seems to us, is the principle to which are to be referred those cases, hereafter to be mentioned, in which corporations have been held to be affected with notice of facts known to some of their directors acting officially upon matters in which they had a personal interest." (36 Am. Dec. 193.)

(See, also, *Bank of New Milford v. Town of New Milford*, 36 Conn. 93; *Brobston v. Penniman*, 97 Ga. 527; *Morris v. Georgia Loan Co.*, 109 Ga. 12; *Holden v. New York and Erie Bank et al.*, 72 N. Y. 286.)

The note, however, continues:

"Where the agent or officer of a corporation is also agent of another corporation or person, and there are mutual dealings between the principals through the intervention of such agent, the question as to whether either principal is to be affected with notice of what is known to the officer or agent by virtue of his relation to the other principal will depend upon circumstances.    If the knowledge is such as the principal himself, if present, would not be bound to communicate, there would seem to be no reason why the agent should be presumed to have communicated it.    Thus, if one of two corporations having a common officer borrows money of the other, through the intervention of such officer, for a purpose which is illegal, or enters into a contract which is *ultra vires,* the other corporation ought not to be charged with notice of the facts: *In re Marseilles etc. Co.,* L. R., 7 Ch. App. 161; *In re Contract Corporation,* L. R., 8 Eq. 14.    The two corporations are dealing in such a case as strangers, and the fact that they have a common officer or other agent ought to make no difference in the transaction.    There is in reality in such a case a conflict of duty on the part of the agent.    He has knowledge of certain facts which it is his duty to one principal to conceal, and to the other to communicate.    There can, therefore, be no presumption either way, and the question of notice depends upon whether he did in fact communicate the information."    (36 Am. Dec. 193.)

In *Whittle v. Vanderbilt Mining & Milling Co.,* 83 Fed. 48, it was said:

"The reason  .  .  .  why the knowledge of a corporate director, relating to a transaction with the corporation, in which he is personally concerned, and acts for himself, will not be imputed to the corporation, is that his adversary interests are such that he will not be likely to communicate to the corporation  a  fact which he is thus interested in concealing.    This reason applies as strongly when the interested director acts for the corporation as when he does not so act, and therefore the cases are indistinguishable."    (Page 54.)

And in *Bank of Overton v. Thompson,* 56 C. C. A. 554:

"It is fairly well settled that knowledge of an agent, actually concealed from his principal, while the agent is dealing with the principal on his own account, is not to be imputed to the principal, even though the agent, assuming to act as such, did whatever was done on the part of the principal in the transaction with himself, if disclosure of the matter concealed would have had a tendency to defeat his purposes. His position would be as antagonistic to his principal, and his motive for concealment as great as, and easier of accomplishment than, if he were dealing with the principal directly, or with another agent." (Page 557.)

Other cases bearing more or less directly upon this point are included in a note to that last cited. (See, also, *La. State Bank v. Senecal,* 13 La. 525, and *Commercial Bank v. Cunningham,* 41 Mass. 270.)

Even if in this case the other officers of the bank took no part in lending the money, it does not follow that their ignorance of the corporation's affairs had no effect upon the transaction. If they had known its condition they might have interfered and prevented the loan. The interest of the cashier as a stockholder of the oil company, desiring the loan to be made, lay in not disclosing to them any fact tending to impair its credit. The findings affirmatively show that none of them was in fact informed of the stock having been issued at a discount. The failure of the cashier to consult with the officers who should have passed upon the matter would create a situation much the same as though he had submitted it to their decision and withheld this information from them. We think his knowledge can not be considered as that of the bank.

In volume 4 of his Commentaries on the Law of Corporations (§ 5212) Seymour D. Thompson used this language, the last sentence of which is omitted from the corresponding section (2 Thomp. Corp., 2d ed.,

§ 1658) of the revision of the work published as a second edition:

"Where two corporations have dealings with each other through the intervention of a mutual agent, the question whether or not one of the corporations is to be charged with notice of what is known to the agent by virtue of his relation to the other corporation must depend largely upon the circumstances of the particular case. . . . It must be obvious that, where the mutual agent is thus situated, it will become a *question of fact* whether he is interested in cheating one corporation at the expense of the other; and if it is found that he is so interested, it would be a very unjust principle that would impute to the corporation which he is endeavoring to cheat his knowledge of facts which he is interested in concealing from it."

In this quotation fraud is doubtless spoken of in order to present in its most extreme form the injustice of imputing to a corporation the knowledge which its active agent possesses, but which he is interested in concealing. The existence of a fraudulent purpose is not necessary to make the principle applicable. In the present case there is no suggestion of any bad faith, but the rights of the parties are to be measured by a general rule, one test of the soundness of which is the barrier it opposes to unfairness in particular cases. In a transaction in which the officer does not act for the corporation he is presumed not to have communicated any knowledge which he has an interest in concealing. So, where he does represent the company, he ought not to be regarded as using in its behalf information which he possesses, but which he has a personal motive in ignoring. Suppose the cashier of a bank, acting either alone or in conjunction with other officers whom he does not advise of the facts, makes a loan to himself, taking as security a mortgage upon land which is apparently unencumbered, but which he knows is subject to an unrecorded mortgage: the bank, through an agent by whom it acted in the matter, has in a sense

actual notice of the existence of the prior lien, but to deny it the benefit of the record title would be to apply a harsh and inequitable rule. The present situation differs only in degree from that supposed. Here the cashier had a personal interest in the money being lent to the oil company; he knew that instead of having a capital of $1,000,000, as the charter stated, the corporation had but $25,000; his own ends were best served by not imparting his knowledge to others, and by not permitting his own conduct to be influenced by it. He must be presumed not to have communicated it, and not to have acted upon it. Under such circumstances the bank could have derived no benefit from it, and should not be deemed to have possessed it. Of course, in a situation where the application of the rule here followed would work a fraud or injustice upon an innocent and diligent third party, a very different question would be presented, and it may be that each case should be controlled by a balancing of equities. Here the stockholders who are held liable can not be regarded as free from fault. By launching the corporation with a nominal capital of $1,000,000 they gave it a fictitious basis of credit, and incurred the risk of personal liability to that amount, which they could expect to avoid only in special instances, as a matter of exceptional good fortune. That the facts are held not to bring them within the exception does not argue the result unjust.

Several cases in addition to those already cited tend to support the position of the defendants. A headnote to *Berry v. Rood,* 168 Mo. 316, as reported in 67 S. W. 644, reads:

"Where a certain corporation borrowing and a corporation lending money are represented in making the loan by one who is the president of both corporations, his knowledge that the capital stock of the borrowing corporation has been paid up in property at an inflated value is notice to the lending corporation, which will prevent it from being entitled to require a stockholder

to make his subscription good by paying up to the par value of the stock."

The substance of this language is quoted in volume 2 of the second edition of Thompson on Corporations, section 1660. A sentence in the opinion supports the view so stated, but the decision was not based upon it and the question involved was not discussed further. Such a rule was applied in *Lea, et al. v. Iron Belt Mercantile Co.,* 147 Ala. 421, but mainly upon the ground that the officer of the corporation making the loan owned nearly all of its stock, and the transaction from its standpoint was in fact for his own benefit.

The judgment is affirmed.