[No. 4195.]

## FIRST NATIONAL BANK OF GRANADA V. MARTIN.

PRINCIPAL AND AGENT—*How Far Principal Affected by Knowledge of the Agent.* The principal is not affected by the knowledge of the agent in a matter in which he acts entirely for himself. (532.)

Defendant dealing with the cashier of a bank, in a matter in which he was acting entirely for himself, as defendant knew, executed, at the cashier's request, a promissory note to the bank. The discount committee of the bank, being informed by the cashier that he had taken the note upon the sale of property accepted it, and the cashier obtained the money thereon. *Held* that the cashier's knowledge of the transaction was not to be imputed to the bank. (531, 532.)

*Error to Prowers District Court.* HON. A. WATSON MC-HENDRIE, Judge.

MESSRS. MERILL & M'CARTY and MR. C. E. SNYDER, for plaintiff in error.

No appearance for defendant in error.

BELL, J.

The First National Bank of Granada, plaintiff in error and plaintiff below, hereinafter called plaintiff, instituted this action against A. P. Martin, defendant in error, and defendant below, hereinafter called defendant, to recover of him the sum of $1,555.22, with interest, the amount of two promissory notes, dated Dec. 12, 1911, signed by him, and payable 6 months after the date thereof to its order.

A defense of no consideration was interposed, and upon trial to the court with a jury, a verdict was returned in favor of defendant, and judgment was entered accordingly.

The answer, for a first defense, contains a general denial, and for a second defense, which, with the exception of the first paragraph thereof, is denied by replication, alleges as follows:

"That at and for a long time prior to the 12th day of December, 1911, one J. L. Mayfield was an officer and cashier of the First National Bank of Granada, Colorado, the plaintiff in this suit; that at and for a long time prior to said above mentioned date the defendant herein was the agent of said Mayfield, duly selected and constituted by him for the purpose of disposing of certain real estate, either by sale or exchange, then owned by said Mayfield in Colorado Springs, Colorado City, and the immediate vicinity thereof, in El Paso county, Colorado, and that defendant then resided in said City of Colorado Springs.

"That for some time immediately preceding and at said above mentioned date, negotiations were about to be consummated by defendant or agent for said Mayfield for the sale of certain property so owned as aforesaid, but on account of delays incident to the final closing, or anticipated closing, of a deal wherein the said Mayfield, if the consideration therefor was paid, would receive the sum of approximately $1,600, the said Mayfield, on or about December 12th, 1911, came to Colorado Springs and informed the defendant that he could not await the closing of any real estate deal; that he wanted the use of the money he was to receive therefrom at once, and said Mayfield then informed this defendant that he had arranged with plaintiff, said First National Bank of Granada, of which he was the cashier, that if defendant would execute and deliver to Mayfield a note payable in form to said bank, as payee, that he, the said Mayfield, as its cashier, had arranged with said bank that said obligation was to be taken by it as the obligation of Mayfield, and that he would pay and become personally responsible for the payment of said note upon its maturity, and that said bank agreed to take said note, not as the obligation of this defendant, but as the obligation of Mayfield, and would look to him solely for the payment of the same in consideration of the said Mayfield having agreed with said bank to turn over to it or apply towards the pay-

ment thereof all or any portion of the proceeds from the
sale of the property so belonging as aforesaid to the said
Mayfield; that said Mayfield further represented and stated
to defendant at said time that on account of being cashier
of said bank, it was not allowable under the law for said
bank to loan money to its officers on unsecured obligations,
and that he had arranged with his said bank that as a mat-
ter of form the notes would have to be made and signed in
the manner suggested by him, and that upon delivery to the
bank by the said Mayfield, the latter would withdraw the
money thereon.   That defendant, upon such information,
and in consideration of the representations so made as afore-
said, agreed to sign the said notes; whereupon the said May-
field suggested making the same in two different notes, and
he then and there, and on the date aforesaid, drew up the
two promissory notes, as set forth in the plaintiff's com-
plaint, and upon the said representations so made as afore-
said by said Mayfield to defendant, and in reliance upon the
same, defendant was induced to and thereupon did sign and
deliver to the said Mayfield the aforesaid notes; that but for
said representations so made by Mayfield, this defendant
would not have signed the said notes.

"Plaintiff further alleges that he received no consider-
ation, either money or thing of value in any manner or form
for the signing of the said notes, and that in no manner or
form did he in any way deal directly with or have negotia-
tions with the said plaintiff, save and except as above re-
cited; that no consideration was ever paid to or received by
this defendant for the signing of said notes, either from the
said bank or any one in its behalf, or from the said May-
field, or any one in his behalf, or at all.   That said Mayfield
was the agent of and as its cashier acted for the said bank,
in all aforesaid negotiations, and as such had full authority
to transact the business of said bank, and the said bank,
the plaintiff herein, received the said notes from the said
Mayfield with knowledge of the manner, as aforesaid, in

which the same had been procured, and with the understanding and agreement, as aforesaid, with its said agent and cashier, that said notes were received by it as the obligation of and that it would look solely to the said Mayfield for the payment thereof, and not to this defendant, and that it did not take said notes as the obligations of the defendant, well knowing that this defendant had received no consideration whatever for the signing of the same.

Much evidence in respect to the real estate operations between Mayfield and defendant was introduced by the parties to the action, which merely raised an issue as to whether or not a certain deed made and delivered by Mayfield and his wife to defendant, for a certain property on Pike's Peak avenue, Colorado Springs, constituted, under the attending circumstances of the transaction, a good, valid and effectual conveyance to defendant of the property therein described, and operated as a good and valid consideration for the giving of the original note, of which those in suit are renewals. This evidence does not assist in a proper determination of the case, except to show the transaction out of which the notes sued upon originated, and further consideration of it need not be given, as the principal and controlling question for review is, whether or not the plaintiff bank is bound by the knowledge had by Mayfield, its cashier, of the facts attending the making and accepting of the original note, from which the action arises.

It appears that in the course of the real estate dealings between Mayfield and defendant, a deed to the Pike's Peak property hereinbefore mentioned was executed and delivered to defendant, and it was understood between them that this property was to realize for Mayfield the sum of $1,250.00. As hereinbefore stated, it is a disputed question, which need not be decided, as to whether or not this deed was intended and accepted as an actual and absolute conveyance of said property to defendant, for the sum of $1,250.00 above mentioned. Defendant denied at the trial that it was so intended

or accepted, but admitted that, some time after the deed had been given, he excuted a note for the amount, with interest, which together amounted to the sum of $1,400.00. This note was made payable to Mayfield, and accepted from him for discount by the plaintiff bank, of which he was then cashier. As the note matured, it was renewed from time to time by defendant giving a note on each occasion for the full amount of the previous one, with the interest due thereon, payable directly to the plaintiff. Concerning the original note and the facts attending the making thereof, defendant's testimony is abstracted as follows:

"Q. Now, Mr. Martin, I wish you would tell the jury just what the circumstances were and how you came to sign this note for—I think it is fourteen hundred dollars, the first note, anyway? A. Mr. Mayfield wrote me in regard to the matter, and made the suggestion about the signing of the note so that he could use the money. Q. Why was the note fixed at the amount that it was, or about that amount? A. When Mr. Mayfield was at my office for the purpose, I suppose, of securing the note, he made the statement that he would like to have some money; he asked me the direct question with regard to how much I felt that we could realize out of this Pike's Peak avenue property. I told him, I says I think we can realize at least twelve hundred and fifty dollars, so as to allow me enough for my commission. I figured fifteen hundred, allowing me two hundred and fifty dollars commission, and the twelve hundred and fifty net. Q. Was there anything said by him to you about your buying it? A. Absolutely nothing; I wasn't purchasing property under any circumstances. Q. And in all subsequent deals after this, did you take it up with him as his agent? A. Everything was reported to him, every transaction and every deal. Q. Now, coming back to the note proposition, what was it he said to you with reference to his wanting money, and wanting you to make a note? A. He made the statement he had to have

the use of some money, and he asked me whether I would not sign the note to the bank so that he could have the use of the money until I turned that property. Q. Did he tell you how he could make use of the money by you signing the note? A. He told me he could use it in the bank, meaning, of course, he would have the use of the money. * * *. Q. What further, if any, discussion was there about this note? A. Just the understanding that was talked over in our conversation in my office; he would look after the note and take care of it, and with that understanding, and placing the same amount of confidence that he was trying to impose in me, I signed the note. Q. Now, when you signed that note, Mr. Martin, what did you receive for it? A. I received nothing. I never did receive anything. Q. To whom was that note made payable to,—Mr. Mayfield or the bank? A. I supposed to the First National Bank of Granada. I have no way of finding out. The first note and second note are still in my possession, but I couldn't find them. I could not locate the first and second notes; they were cancelled and returned. All the other notes were drawn direct to the First National Bank. Q. And when the time run in the note, after it matured, came due, what was done with it? A. I told Mr. Mayfield that the property has not been sold, and I have no way of getting it out of that property and it was up to him to take care of it, as he agreed to do. Q. What did he say about making another note? A. He finally persuaded me to make a new note, and I did. Q. What did you receive for the making of that new note? A. I received the cancellation of the old note, that was all. * * *. Q. And the second note, when that came due, what was done as to the payment of the principal and interest? A. It was signed under the same conditions. Q. Was there another note given? A. That is the last note, I think it was divided in two notes, one for one thousand dollars and one for five hundred and fifty some odd dollars, making it two separate notes."

Mayfield, as a witness for plaintiff, testified that the Pike's Peak avenue property was sold to defendant about August, 1908, and concerning the transaction he said:

"Mr. Martin says to me one day, there will be no trouble in getting your twelve hundred and fifty dollars out of the Pike's Peak avenue property, and if you don't mind I will take that myself and guarantee you that amount of money, providing you give me a right to go out and handle the property and get the money out of it, so I told him that would be all right, that is what I wanted for it, and I would give him a reasonable length of time. He was to pay me twelve hundred and fifty dollars, with interest at six per cent., commencing September 1st, 1908."

On May 18th, 1910, he wrote defendant, in part, as follows:

"Now go in and do what you want to and it will be O. K. I feel sure that some day I will get $1,250.00 and 6 per cent. interest from Sept. 1st, 1908. Now, Mr. Martin, why not just settle this by giving me a note for the amount with interest to Sept. 1st next and have it settled. I can put the note right in the bank here and use the money at once, and it will help me quite a little just now. If you think well of this sign and return the note I inclose, int. added in, and no more interest till due."

In conformity to the suggestion contained in this letter, the note was executed, and at divers times renewed, as hereinbefore stated, and on August 11th, 1911, when one of the renewals was about to mature, Mayfield sent the following letter to defendant:

"I inclose communication from Perkins, Morton & Co. for your reply, as I do not know whether we own this property or not.

"In this connection I desire to say the note of yours we hold will be due Oct. 12th next, and our board has decided not to carry outside paper after that we have on hand matures. It will, therefore, be necessary to pay this note at

that time. Please keep this in mind and try to get the money out of the property as soon as you can, otherwise we will have to dig it some other way."

On October 16th, 1911, he again wrote him as follows:

"Replying to yours of the 9th inst., will say, there has never been a conversation or letter by or from me intimating that you would be relieved from the debt due the bank. It is true that I asked you to sign the note to the bank so I could have use of the money, and always supposed you would pay me. If you want to renew for six months I enclose a blank for that purpose. I leave tonight for Denver for the rest of the week, and unless the matter is taken care of on my return I certainly will take steps to collect."

After the receipt of those letters, defendant again renewed the note by executing those in suit.

Although it is shown that Mayfield's duty, as cashier of the bank, was to pass upon loans, to accept paper for the bank, and to make loans on notes, it nowhere appears that the knowledge that he possessed of the transaction in controversy was ever communicated by him or anybody else to the bank as a corporate body. In fact, the very contrary appears, and is not disputed. When asked if the bank as a corporate body, its board of directors or discount board were ever advised by him or any other person as to the details of the transaction, he replied in the negagtive, and further testified that the discount board of the bank, at its regular meetings, passed upon all notes and discounts accepted and made by the bank; that the note in controversy was passed upon by it; and that he gave them no information about it, other than that it was one he had taken for the sale of property; and defendant, himself, admitted that he did not deal with the bank, except through Mayfield.

From the sworn allegations in defendant's answer, and the evidence as herein reviewed, it is apparent that defendant was aware of the fact that Mayfield, in securing the note for acceptance by the bank, was acting entirely for himself

and not for the bank in a matter which it was to his own interest to conceal. Under such circumstances, it cannot be held that Mayfield's knowledge of the facts of the transaction was imputed to the bank, for a bank is not chargeable with notice of matter which it is to the interest of the officer to conceal, or which was acquired by him while acting in his own behalf, or as the agent of another: 15 Cur. Law, 457, citing *First Nat. Bank v. Lowther-Kaufman Oil & Coal Co.*, 66 W. Va. 505, 66 S. E. 713, 28 L. R. A. (N. S.) 511; *Lilly v. Hamilton Bank*, 178 Fed. 53, 102 C. C. A. 1, 29 L. R. A. (N. S.) 558; *State Bank of Moore v. Forsyth,* 41 Mont. 249, 108 Pac. 914, 28 L. R. A. (N. S.) 501; and *First Nat. Bank v. Northrup*, 82 Kan. 638, 109 Pac. 672, 136 Am. St. 119.

In 5 Cyc. 461, 463, it is said that "when an officer is individually interested in a note or other matter, the better opinion is that his knowledge is not to be imputed to the bank, since his interest is best served by concealing it," and, further, that "the knowledge of a bank director is not chargeable to his bank with respect to all discounts and other matters in which he is interested, for the presumption is that he will not communicate them, since his purpose would be best served by maintaining silence."

The case of *State Bank of Mooore v. Forsyth, supra,* is almost identical to the one at bar, and contains an elaborate review of authorities and a comprehensive discussion of all the questions presented by the pleadings and evidence under consideration herein. In view of the rules and principles of law as therein expressed, it must be held that the record before us fails to disclose any knowledge on the part of the bank of the facts attending the execution of the original note in controversy, or the subsequent renewals thereof, and that the trial court erred in denying plaintiff's motion for a directed verdict. Therefore, its judgment is hereby reversed, and the case remanded with instructions that judgment be entered for plaintiff, as prayed for.

*Reversed and remanded.*