SLATER TRUST CO. v. GARDINER et al.

(Circuit Court, S. D. New York. November 10, 1910.)

1. CORPORATIONS (§§ 222, 335*)—LIABILITY OF OFFICERS AND STOCKHOLDERS—MISREPRESENTATIONS IN MORTGAGE.

A corporation executed a trust mortgage to secure an issue of bonds, covering its property described therein as 47,000 acres of "lands," and the bonds were sold in the market; purchasers being induced to buy by circulars containing a copy of the mortgage. In fact, except as to 700 acres, the company did not own the lands in fee, but merely the coal underlying them. The preparation of the mortgage and the description of the property therein were left by the directors to competent and experienced counsel, who knew the facts. *Held* that, conceding that the description of the company's lands as lands was erroneous and misleading, neither the president of the company, who signed the mortgage in its behalf, with knowledge of the facts, nor stockholders, who authorized its execution, were personally liable for deceit to a bondholder, who was misled by such description and suffered loss by reason thereof.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. §§ 222, 335.*]

2. CORPORATIONS (§§ 222, 335*)—OFFICERS AND STOCKHOLDERS—LIABILITY IN EQUITY.

Officers and stockholders of a corporation cannot be held to have personally warranted the truthfulness of representations made in a mortgage executed by the corporation, so as to authorize a court of equity to require them to make such representations good at the suit of a bondholder who bought in reliance thereon, where they are not chargeable with acts which would render them liable at law for deceit; nor can relief in equity be granted against them by way of rescission on the ground of mutual mistake, since they were not parties to the transaction as individuals, and did not receive the consideration paid for the bonds.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. §§ 222, 335.*

Stockholders' liability to creditors in equity, see notes to Rickerson Roller Mill Co. v. Farrell Foundry & M. Co., 23 C. C. A. 315; Scott v. Latimer, 33 C. C. A. 23.]

In Equity. Suit .by the Slater Trust Company against James T. Gardiner, William A. Read, and John R. Hegeman. Decree for defendants.

Delmas, Towne & Spellman, for complainant.
Strong & Cadwallader, for defendant Read.
Rushmore, Bisbee & Stern, for defendant Gardiner.
Carter, Ledyard & Milburn, for defendant Hegeman.

HAND, District Judge. As this case goes off upon one point, and it is therefore not necessary, or proper, to consider any others, I shall, for the sake merely of raising that point sharply, dispose of the suit upon the assumption that the complainant has proved all the facts which he alleges he has proved upon page 28 of his brief. On that page he sums up what he claims to have proved in the following words:

"That the mortgage was executed to secure an issue of $3,000,000 of bonds to be sold to the public; that. it represented the mortgagor to be the owner of 47,000 acres of land in fee; that. had this representation been true, the security given for the bonds would have been ample; that. in order to facilitate

the sale of the bonds to the public, the company had caused the mortgage to be printed in pamphlet form and these pamphlets to be publicly distributed; that a person examining these pamphlets would be fully justified in understanding that the mortgage was intended to cover, and did cover, 47,000 acres of land which the company was the owner of in fee; that among the purchasers of these bonds were Mackay & Co., bankers in New York, whose purchase amounted to $600,000; that, in making that purchase, Mackay & Co. knew of the representations contained in the mortgage, relied upon them, and bought, believing the company to be, as represented, the owner in fee of the land given as security; that of the 600 bonds it had purchased, Mackay & Co. sold 25 to the Slater Trust Company; that, in buying, the Slater Trust Company likewise relied upon the statements contained in the mortgage, and, but for its belief that those statements were true, would not have made the purchase; that the representation as to the ownership of the land by the company in fee was false, save only as to 700 acres: that the fact that it was false was apparent upon the very face of the conveyances through which the company claimed title to the property, since all of said conveyances—save as to 700 acres, as above stated—showed in plain and unmistakable terms that they conveyed, not the fee to the land, but merely the coal underlying it; that by reason of this falsity the security given for the bonds was utterly inadequate, and, instead of being worth, as it would have been, had the representations been true, $3,000,000, it realized upon foreclosure only $100,000."

The defendant Gardiner, who signed the mortgage in the company's name and as its president, is more directly connected with the enterprise than any one else; and if he be not liable, neither of the others are, whose share in uttering the false statements was limited to signing a stockholders' consent to the execution of the mortgage. As to Gardiner's knowledge, he concedes that he knew that they had only a small surface ownership, no more than enough to work the measures economically, though it was all that was usual in such cases. It is true, therefore, that he knew substantially the facts of the company's ownership. Nevertheless, it is also true that he left the reduction of the facts to legal form wholly to the company's lawyers, who were competent, as no one disputes, and who in turn put the preparation of the description of the realty interests into the hands of equally competent Missouri counsel. Gardiner signed the document in entire reliance upon the correctness of the reduction of the facts to proper legal form. In fact, the lawyers described the ownership of the measures in fee as "lands," which the opinion upon the demurrer has held to be erroneous and misleading. This is Gardiner's connection with the matter.

These being the facts in small compass as the complainant himself asserts them—for I do not mean to be taken as deciding on the truth of any one of them—what is the law? I must take from Judge Martin the fact that the bill has equity, and is not open to demurrer. The complainant suggests two legal theories: The first, that it is a bill for restitution in kind because of a common-law tort—i. e., deceit; the second, that equity will relieve in any event, even if no tort be committed upon which a court of law might give damages. Judge Martin took a third theory; i. e., that it was an action at law, for deceit, which got into equity because of the number of the plaintiffs who would have to sue.

The question is whether a man, knowing the facts, who asks skillful lawyers to prepare a trust mortgage conveying the legal rights of a

company over which he is president, is responsible for the resulting damage because the words describing the property erroneously include the surface, which the company does not in fact own. It must be remembered that Gardiner did not employ the lawyers who drew up these papers, and is not responsible for them as his agents.

At the outset the character of the mistake must be observed. Gardiner knew the facts, but he did not know the meaning of the words. Although the great weight of authority is to the contrary (Derry v. Peek, 14 App. Cas. 337), I may assume for the purposes of this case that a man may be responsible for his uttered false words, even when he believes them to be true.

Such authorities as hold to this rule regard the uttered word as the cause of the damage, which, of course, it is, and they hold that a man, by speaking or writing words on which he knows others will rely, must be held to their truth quite as much as though he made a promise (Mr. Justice Holmes dissentiente, Nash v. Minnesota Title Co., 163 Mass. 574, 40 N. E. 1039, 28 L. R. A. 753, 47 Am. St. Rep. 489; Pollock on Torts [6th Ed.] page 283). But these authorities, which regard the word as the tortious act, certainly should not, in analogy with the other law of torts, be supposed to mean that a man should be responsible for the remote results of his words. The extent of his responsibility, indeed, ought to be limited, as it is in other torts, to those matters which would come within the foresight of the hypothetical reasonable man. With remoter damage it is as unjust to charge the words of his mouth as the movements of his legs or arms. Although they do not in these words indicate the distinction, I think that this is the explanation of such of the cases as make negligence the test, and of these there are a number.

If Gardiner was responsible for the words he uttered, regardless of scienter, at least he was not responsible for such consequences as no man could avoid with the use of reasonable care. What happened in spite of the exercise of such care was remote, within all the analogies of the law of torts. "Causa proxima non remota spectatur." Nor does it make any difference that it was in respect of the meaning of his words that he was mistaken. The utterance of a word is one thing; its eventual interpretation by a reader is another, and is as much the external consequence of its utterance as anything else. A given interpretation, even a legal one, may be, from the point of view of the original utterer, so remote a consequence that no one ought in justice to be held accountable for it. For example, in the case at bar, if Gardiner did all a layman could do to get the facts set down correctly, the interpretation that J. T. Woodward put on the words Gardiner was not bound to anticipate, not even if it was the right one.

The authorities do not make any distinction between the discrepancy of the statement with the facts stated and the discrepancy of the statement with its subsequent interpretation. Thus in Derry v. Peek, 14 App. Cas. 337, it appeared that the directors who issued the prospectus knew all the facts and trusted their solicitors to prepare the statement correctly (see Lord Bramwell's judgment, page 348); their misstatement was in calling the franchise absolute which was in fact conditional. This statement they successfully justified, because they

regarded the condition attached to the franchise as practically certain of fulfillment and the statement really truthful (Lord Herschell's Judgment, pages 378, 379). The point is that the error was in supposing that the facts which they knew were correctly set forth in the statement. A similar case, where the exact point was passed on by the Supreme Court of Massachusetts, is Nash v. Minnesota Title Co., 163 Mass. 574, 40 N. E. 1039, 28 L. R. A. 753, 47 Am. St. Rep. 489, the dissent in which I have already mentioned. But that dissent proceeds upon the theory that no scienter is ever necessary in an action for deceit.

There is another possible ground upon which to hold Gardiner, which is that, although he believed the statements to be true, they were in fact put in such form as to lead others to suppose that he personally knew them to be true, or at least that he had a greater acquaintance with them than they had. It is familiar law that to say what you do not know as though you did know it is deceit, however much you may believe it. Lehigh Zinc Co. v. Bamford, 150 U. S. 665, 673, 14 Sup. Ct. 219, 37 L. Ed. 1215.

To take up the evidence upon each of these two grounds of liability separately: First, was Gardiner guilty of any neglect in assuring himself that the mortgage correctly represented the facts? What more could he have done than he did? Before signing, he got the assurance of most experienced counsel in New York, who left it to most experienced counsel in St. Louis, that the legal rights of the company were described in such words as, under the law of Missouri, where the land lay, most accurately covered them; nor do I say that the words were in fact misleading, for upon that, as I have said, I simply follow Martin, J. If Gardiner had interfered himself, he would justly have been chargeable with recklessness. The complainant would then have rightly said that, if he had only left to experts matters as to which he knew, and could know, nothing at all, no damage would have been done. These descriptions were pre-eminently "words of art," depending upon local law, and were a part of one of the most complicated documents known to the law. That was the very purpose of giving it over to local experienced lawyers to draw, and their purpose in employing the best man they could in Missouri to pass upon the descriptions. No man should be called on to foresee that, after this care in reducing to written form the legal rights of the company in a mortgage, a mistake would be in fact made which would result in damage to a bondholder. To prevent such a result the best way was to employ lawyers, who are used to such matters. If not, then to issue such a statement is to warrant for its correctness. Neither the man who issues it nor the man who receives it understands anything of the sort.

The only remaining ground of deceit is that, though he believed the statements to be true, Gardiner stated them as though he knew their truth, or at least more than he did know. This altogether depends upon what personal knowledge a reader would suppose that the president of a company would have of the allegations in a trust mortgage regarding its real property. Perhaps it is true that he should have a knowledge of the extent of its property, as Mr. Delmas says; but that

is not the question here. Gardiner did have such knowledge, and could doubtless have stated it accurately enough in his own way; but these statements occur in a legal document, which he could not have drawn if he would. To suppose that the statements in legal phrase of the ownership of the company's land emanated from the personal knowledge of the president, or that he vouched for their accuracy himself, is so extraordinary a contention that it need not take up any time to refute. All sensible people know perfectly well that in such matters the attorneys have sole control; that they prepare the descriptions from the records, and are charged with all the responsibility; that the formal language of conveyance in such a mortgage is as little the result of any personal acquaintance of the officers who sign it as the manufacture of the paper on which it is written. If a man reads it, and thinks that the president has personally prepared the descriptions after an examination of the deeds, or that he knows in the least what ought to be the language to describe the ownership in fee of coal in situ, as opposed to ownership in fee of both coal and surface, he has only himself to thank for his ignorance. This, therefore, disposes of any liability of Gardiner for deceit.

Having, therefore, disposed of Gardiner's liability, little need be said as to Read and Hegeman. Assuming, what I believe to be untrue, that by signing the consent to the mortgage as stockholders, they vouched in any way at all for the statements contained in it, they did so precisely as Gardiner did. Hegeman did not apparently know anything at all about any of the facts. As to him the case is absolutely without color of justification. Read knew in a general way that it was "not a farming proposition," and knew that the surface acreage was about 700, though just when he learned that he did not know. However, like Gardiner, he relied, and could only rely, upon the correctness of the mortgage as the lawyers drew it up. It is true that Read had originally been the client personally, and it might be necessary in his case alone to consider whether, in drawing up the supplemental mortgage, he remained the principal, though, in view of Gale's testimony, there cannot be much doubt that he did not; but all such questions Mr. Delmas voluntarily put out of the case by expressly asserting upon the argument several times that he did not seek to charge any of the defendants through the tort of their agents, but for their personal acts.

In so far, then, as the suit sounds in tort for deceit, it will fail. This was the ground of the opinion of Martin, J.; but the complainant insists that he need not rest on it alone, and that equity will grant relief, regardless of whether an action at law would lie. As I understand his theory, it is that, regardless of any tort such as law would recognize, equity will compel the defendants to make good the representations of the mortgage, and so acquire the fee of the soil. The best answer is that the defendants never promised to do anything of the kind. When they created a corporation to make promises, they did it to avoid making themselves liable personally, and every one who dealt with the corporation so understood perfectly well. Of course, that did not relieve them from the consequences of their torts, if they committed any;

but it did relieve them from any voluntary engagement. To hold them liable on the covenants would be to create an obligation which they did not mean to assume, and which the bondholders did not expect to get. It is not necessary to resort to the twenty-second article of the original mortgage to meet any contractual obligation.

The liability must, therefore, sound in tort; and, since there is no proof of legal tort, it must be some actionable deceit known only to equity, which does not exist. Arkwright v. Newbold, 17 Ch. Div. 301, 320; Derry v. Peek, 14 App. Cas. 337, 360. The nearest analogy is the right of rescission under a mutual mistake; but the complainant misconceives that remedy, if he supposes that it helps him. Such cases proceed upon the theory that, had the facts all been known, the transaction would not have taken place, and upon their actual discovery each person holds in trust what he got, as he ought in justice to do, for the benefit of him from whom he got it. Therefore the relief is in such cases always limited to a restoration of the parties to the status quo. Certainly, when the defendant has been innocent of conscious misstatement, rescission is not based upon a legal wrong antedating the discovery of the mistake. The rule as to the allowance of interest in such cases is proof enough of this. In the case at bar, none of the defendants have received anything of the complainant which they now wrongfully retain, nor has there been any transaction between them to unravel. It was the company which got the money and used it; and, if the defendants are liable, it is because they committed some wrong when they uttered the statement.

The complainant suggests no authority which in the least bears out his contention of the law, unless it be the litigation of O'Beirne against Bullis and Barse, which was long pending in the courts of New York, and which eventually got into the Supreme Court in the case of Bullis v. O'Beirne, 195 U. S. 606, 25 Sup. Ct. 118, 49 L. Ed. 340. The facts of that case, as stated by Mr. Justice Day quite completely in 195 U. S. 606, 25 Sup. Ct. 118, 49 L. Ed. 340, were that Bullis and Barse, the defendants, knew that what they said was false, and intended to deceive when they uttered it. Such was one of the specific findings of the New York Special Term, which was afterwards affirmed. The Supreme Court felt obliged to determine that such intentional deceit was the gravamen of the suit, in order to decide that it survived discharge in bankruptcy. Whatever be the explanation for the relief granted in that case, it is quite clear that it was relief upon a cause of action in deceit at common law, and that the Court of Appeals of the state of New York had no intention of deciding that it was enough to prove that Bullis and Barse made statements, in fact untrue, which they supposed to be true. The peculiarity of that case, in so far as it is peculiar at all, arises from the forum in which the relief was given, and the precise form it took. That it was relief based upon the usual state of facts necessary in deceit no one can doubt who takes the trouble to read the opinions.

There is no theory, therefore, upon which the complainant can succeed, and the bill must be dismissed, with costs.

Let such a decree pass.